[No. S141541. July 21, 2008.]

KIRK CRAWFORD et al., Plaintiffs and Appellants, v.
WEATHER SHIELD MFG., INC., Defendant and Appellant.

542

## COUNSEL

Anderson & Kriger, Clayton Anderson, Philip Y. Kim; and Richard H. Benes for Plaintiff and Appellant Kirk Crawford.

Kabateck & Garris, Kabateck Brown Kellner, Brian S. Kabateck, Alfredo Torrijos and Richard L. Kellner for Plaintiff and Appellant Parviz Alai.

Cooper, White & Cooper, Kathleen F. Carpenter and Carol J. Stair for California Building Industry Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Green & Hall, Brian C. Plante and Samuel M. Danskin for Capital Pacific Holdings, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Newmeyer & Dillion, Thomas F. Newmeyer, Jay B. Freedman and Michael B. McClellan for Standard Pacific Corp., KB Home, The Irvine Company, Alexander Communities, Inc., Taylor Woodrow Homes, Inc., and William Lyon Homes, Inc., as Amici Curiae on behalf of Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Christina J. Imre, Stephanie Rae Williams, Orly Degani and Maureen M. Home for Defendant and Appellant.

Summers & Shives and Robert V. Closson for California Framing Contractor's Association as Amicus Curiae on behalf of Defendant and Appellant.

Crawford & Bangs, E. Scott Holbrook, Jr., and Joshua J. Wes for American Subcontractors Association as Amicus Curiae on behalf of Defendant and Appellant.

Horvitz & Levy, Lisa Perrochet and John A. Taylor, Jr., for California Professional Association of Specialty Contractors, Pacific Rim Drywall Association and Southern California Contractors Association as Amici Curiae on behalf of Defendant and Appellant.

McAtee • Harmeyer and Jeff G. Harmeyer for Jeld-Wen, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Stephan, Oringher, Richman, Theodora & Miller, Theodora Oringher Miller & Richman, Harry W. R. Chamberlain and Robert M. Dato for American Architectural Manufacturers Association as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**BAXTER, J.**—Standard comprehensive liability insurance policies provide that the insurer must both indemnify and defend the insured against claims within the scope of the policy coverage. The insurer's duty to defend is broader than its duty to indemnify. The latter duty runs only to claims that are actually covered by the policy, while the duty to defend extends to claims that are merely potentially covered. (E.g., *Buss v. Superior Court* (1997) 16 Cal.4th 35, 45–46 [65 Cal.Rptr.2d 366, 939 P.2d 766] (*Buss*); *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) "The [insurer's] defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . ." (*Montrose, supra,* at p. 295.)

Here, however, we address issues concerning the contractual duty to defend in a *noninsurance* context. We consider whether, by their particular terms, the provisions of a pre-2006 residential construction subcontract obliged the subcontractor to defend its indemnitee—the developer-builder of the project—in lawsuits brought against both parties, insofar as plaintiffs' complaints *alleged* construction defects arising from the subcontractor's negligence, even though (1) a jury ultimately found that the subcontractor was not negligent, and (2) the parties have accepted an interpretation of the subcontract that gave the builder no right of *indemnity* unless the subcontractor was negligent. We conclude that the answer is yes. We will therefore affirm the judgment of the Court of Appeal.

## FACTS AND PROCEDURAL BACKGROUND

The basic facts are not in dispute. J.M. Peters Co. (JMP) was the developer, builder, and general contractor of a large Huntington Beach residential project. Weather Shield Mfg., Inc. (Weather Shield), contracted with JMP to manufacture and supply wood-framed windows for the project. In the contract, Weather Shield promised (1) "to indemnify and save [JMP] harmless against all claims for damages . . . loss, . . . and/or theft . . . growing

out of the execution of [Weather Shield's] work," *and* (2) "at [its] own expense to *defend any suit or action* brought against [JMP] *founded upon* the claim of such damage[,] . . . loss, . . . or theft." (Italics added.)

In September and October 1999, 220 owners of 122 finished homes in the project sued JMP, Weather Shield, and other participants in the project's construction. The defendants included Darrow the Framing Corporation (Darrow), the project's principal subcontractor, whose responsibilities included framing the structures and installing the windows. The complaints alleged numerous construction defects, including electrical, plumbing, roofing, chimney, framing, and other structural problems. As relevant here, they also asserted that, because of improper design, manufacture, and installation, windows in the homes, including those supplied by Weather Shield, leaked and fogged, causing extensive damage. Theories of negligence, strict liability, breach of warranty, and breach of contract were set forth.[1]

In April 2000, JMP cross-complained against Weather Shield, Darrow, and all the other project subcontractors sued by the homeowners. The cross-complaints asserted, among other things, that under the pertinent subcontract provisions—all of which had been drafted by JMP and were identical on the point—the subcontractors owed JMP duties of indemnity and defense against the homeowners' complaints. The cross-complaints sought declaratory relief with respect to JMP's alleged indemnity and defense rights.[2]

JMP, and all the subcontractors except Weather Shield and Darrow, settled before trial. The "sliding scale" settlement agreement provided the homeowners a minimum payment of $2.55 million, and guaranteed an additional sum of $1.45 million against any recovery from the nonsettling subcontractors. The settling defendants also agreed to assist the homeowners in prosecuting their claims against the nonsettling parties. JMP and the settling subcontractors mutually released all claims, demands, and liabilities among themselves. All complaints and cross-complaints were dismissed except as to Weather Shield and Darrow.

---

[1] The cases were consolidated for pretrial and trial purposes.

[2] JMP's cross-complaints alleged that the cross-defendant subcontractors had a "present" duty to provide, and JMP had a "present" right to receive, a contractual defense. Each cross-complaint also recited that "[b]y way of this Cross-Complaint, [JMP] hereby tenders the defense of this action to the Cross-Defendants, and each of them, pursuant to the applicable subcontracts. [JMP] is informed and believed and based thereon alleges that the Cross-Defendants, and each of them have and/or will reject, ignore, or fail to properly accept the tender of defense." The record is silent as to whether JMP had previously tendered defense of the homeowners' actions to the cross-defendant subcontractors, or any of them. Weather Shield does not urge on appeal that it was absolved of any duty to defend by reason of JMP's failure to timely tender the defense of the homeowners' actions.

In July 2002, during final pretrial proceedings, Weather Shield moved to dismiss the homeowners' strict liability causes of action. The motion cited then extant case law holding that a subcontractor hired by a developer—even a subcontractor that supplied a component product rather than a service—could not be strictly liable for defects in mass-produced homes, unless the subcontractor also owned or controlled the housing development. (See, e.g., *Casey v. Overhead Door Corp.* (1999) 74 Cal.App.4th 112, 119–120 [87 Cal.Rptr.2d 603] (*Casey*); *La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1146 [261 Cal.Rptr. 146] (*La Jolla Village*).) The court granted the motion, subject to a reevaluation of prejudice in the event of an intervening change in the law.

The window leak and framing issues went to trial against Weather Shield and Darrow on the remaining theories of negligence and breach of warranty. In October 2002, the jury returned general verdicts against Darrow and in favor of Weather Shield. The jury awarded the homeowners approximately $1 million in damages against Darrow. Following the jury verdict, Darrow settled all the complaints against it.

Thereafter, in March 2003, JMP's cross-complaint against Weather Shield was separately tried to the court. JMP sought both (1) express indemnity for amounts paid to the homeowners in settlement, and (2) under the duty-to-defend provisions of Weather Shield's subcontract, attorney fees and expenses incurred by JMP in defending itself against the homeowners' suit.

The trial court ruled that the subcontract's terms obliged Weather Shield to indemnify JMP for amounts paid to the homeowners only if Weather Shield was found negligent. Thus, the court determined, the jury's verdict that Weather Shield was not negligent absolved Weather Shield of indemnity liability in this case. On the other hand, the court concluded, the subcontract did give Weather Shield responsibility for JMP's legal defense against the homeowners' claims, insofar as those claims concerned the windows supplied by Weather Shield, regardless of whether Weather Shield was ultimately found negligent.

JMP presented evidence that it had incurred $375,069 in attorney fees to defend the homeowners' claims, and that 70 percent of the homeowner settlement amount was attributable to the window problems. JMP therefore urged that, under their subcontracts, Weather Shield and Darrow were together liable for 70 percent of JMP's defense fees, or $262,548. The court apportioned this amount equally between Darrow and Weather Shield, and therefore awarded JMP $131,274 in damages against Weather Shield. The court also found Weather Shield contractually liable to JMP, as the prevailing party on JMP's cross-complaint, for $46,734 in attorney fees incurred by JMP to prosecute the cross-action.

Meanwhile, in December 2002, this court held in *Jimenez v. Superior Court* (2002) 29 Cal.4th 473 [127 Cal.Rptr.2d 614, 58 P.3d 450] (*Jimenez*) that, contrary to the teaching of such cases as *Casey, supra,* 74 Cal.App.4th 112, and *La Jolla Village, supra,* 212 Cal.App.3d 1131, the manufacturer or supplier of a component part installed in a mass-produced home may be held strictly liable when a defect in the component causes damage to other parts of the structure. (*Jimenez, supra,* at p. 484.)

Following entry of judgment in this case in March 2003, the homeowners moved for a judgment notwithstanding the verdict (judgment NOV) (Code Civ. Proc., §§ 629, 659) and a new trial (*id.,* §§ 657, 659) against Weather Shield. Among other things, the homeowners asserted that, under *Jimenez,* they were entitled to try their previously dismissed strict liability causes of action. In May 2003, the court denied the motion for a judgment NOV, but granted a new trial against Weather Shield on the issue of strict liability.

Weather Shield appealed (1) the new trial order, and (2) the declaratory relief judgment insofar as it required Weather Shield to reimburse JMP's expense of defending the homeowners' action and prosecuting JMP's cross-complaint. Two of the groups of homeowner plaintiffs filed protective cross-appeals from the judgment against them, and in Weather Shield's favor, on the construction-defect claims. JMP did not appeal the order absolving Weather Shield from contractual indemnity liability for amounts paid by JMP to the homeowners.[3]

In a divided decision, the Court of Appeal affirmed the orders and judgments challenged by Weather Shield, and dismissed the cross-appeals as moot. On the issue of Weather Shield's liability for JMP's defense, regardless of its own negligence, the majority reasoned, in essence, that Weather Shield's promise "to defend" JMP against suits founded upon claims arising out of the execution of Weather Shield's work necessarily contemplated an immediate duty to provide a service, which duty arose at the time such a suit was brought and a defense was therefore needed. Thus, the majority concluded, the duty could not depend upon the outcome of issues to be litigated in the very action Weather Shield was obliged to defend.

The concurring and dissenting opinion argued that the contract language did not compel the majority's interpretation of the duty to defend. Moreover, the concurring and dissenting opinion urged, policy concerns weigh against allowing a builder or developer with superior bargaining power to impose contractual defense obligations on a nonnegligent subcontractor.

---

[3] We were informed by the parties that, following the trial court judgment, JMP assigned all its rights thereunder to the homeowners. The homeowners then defended JMP's defense-cost award in the Court of Appeal. In this court as well, the homeowners have briefed the defense-cost issue as assignees of JMP's rights under the defense-cost award.

Weather Shield sought review, raising both the new-trial and defense-cost issues. We granted review, limited to the following issue: Did a contract under which a subcontractor agreed "to defend any suit or action" against a developer "founded upon" any claim "growing out of the execution of the work" require the subcontractor to provide a defense to a suit against the developer even if the subcontractor was not negligent?[4] We turn to that issue.

## DISCUSSION

■ Parties to a contract, including a construction contract, may define therein their duties toward one another in the event of a third party claim against one or both arising out of their relationship. Terms of this kind may require one party to *indemnify* the other, under specified circumstances, for moneys paid or expenses incurred by the latter as a result of such claims. (See Civ. Code, § 2772 ["Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person."].)[5] They may also assign one party, pursuant to the contract's language, responsibility for the other's *legal defense* when a third party claim is made against the latter. (See *Mel Clayton Ford v. Ford Motor Co.* (2002) 104 Cal.App.4th 46, 49, 55 [127 Cal.Rptr.2d 759] (*Mel Clayton Ford*).)

As befits the contractual nature of such arrangements, but subject to public policy and established rules of contract interpretation, the parties have great freedom to allocate such responsibilities as they see fit. (*E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 507 [146 Cal.Rptr. 614, 579 P.2d 505] (*E. L. White, Inc.*); *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1276–1277 [87 Cal.Rptr.2d 497] (*Heppler*).) "When the parties knowingly bargain for the protection at issue, the protection should be afforded." (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 633 [119 Cal.Rptr. 449, 532 P.2d 97] (*Rossmoor*); see *Heppler, supra*, at p. 1277.) Hence, they may agree that the promisor's indemnity and/or defense obligations will apply only if the promisor was negligent, or, conversely, even if the promisor was not negligent. (*Heppler, supra*, at p. 1277; *Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 505 [61 Cal.Rptr.2d 668] (*Continental Heller*); *Peter Culley & Associates v.*

---

[4] Subsequent to our grant of review, an issue arose whether, despite our limitation of issues, the pendency of review precluded further proceedings in the trial court under the new trial order, the propriety of which order we did not intend to address. Concluding that there was no reason to delay the homeowners' strict-liability trial while we considered the defense-cost issue, we therefore dismissed review with respect only to the order granting a new trial on that issue, as affirmed by the Court of Appeal. We directed the Court of Appeal to issue a partial remittitur in accordance with the partial dismissal order.

[5] All further unlabeled statutory references are to the Civil Code.

*Superior Court* (1992) 10 Cal.App.4th 1484, 1492 [13 Cal.Rptr.2d 624] (*Peter Culley & Associates*).)

■ In general, such an agreement is construed under the same rules as govern the interpretation of other contracts. Effect is to be given to the parties' mutual intent (§ 1636), as ascertained from the contract's language if it is clear and explicit (§ 1638). Unless the parties have indicated a special meaning, the contract's words are to be understood in their ordinary and popular sense. (§ 1644; *Continental Heller, supra,* 53 Cal.App.4th 500, 504; accord, *Centex Golden Construction Co. v. Dale Tile Co.* (2000) 78 Cal.App.4th 992, 996–997 [93 Cal.Rptr.2d 259] (*Centex Golden*).)

■ Though indemnity agreements resemble liability insurance policies, rules for interpreting the two classes of contracts do differ significantly. Ambiguities in a policy of insurance are construed against the insurer, who generally drafted the policy, and who has received premiums to provide the agreed protection. (See, e.g., *Buss, supra,* 16 Cal.4th 35, 47–48; *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37–38 [36 Cal.Rptr.2d 100, 884 P.2d 1048].) In noninsurance contexts, however, it is the *indemnitee* who may often have the superior bargaining power, and who may use this power unfairly to shift to another a disproportionate share of the financial consequences of its own legal fault. (E.g., *Goldman v. Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 49 [41 Cal.Rptr. 73, 396 P.2d 377] (*Goldman*); see *Regan Roofing Co. v. Superior Court* (1994) 24 Cal.App.4th 425, 436 [29 Cal.Rptr.2d 413] (*Regan Roofing*).)

This public policy concern influences to some degree the manner in which noninsurance indemnity agreements are construed. For example, it has been said that if one seeks, in a noninsurance agreement, to be indemnified for his or her own active negligence, or regardless of the indemnitor's fault— protections beyond those afforded by the doctrines of implied or equitable indemnity—language on the point must be particularly clear and explicit, and will be construed strictly against the indemnitee. (E.g., *E. L. White, Inc., supra,* 21 Cal.3d 497, 507; *Rossmoor, supra,* 13 Cal.3d 622, 628; *Goldman, supra,* 62 Cal.2d 40, 44; *Centex Golden, supra,* 78 Cal.App.4th 992, 998; *Heppler, supra,* 73 Cal.App.4th 1265, 1278.)

For similar public policy reasons, statutory law imposes some absolute limits on the enforceability of noninsurance indemnity agreements in the construction industry. At the time Weather Shield contracted with JMP, a party to a construction contract could not validly agree to indemnify the promisee for the latter's *sole* negligence or willful misconduct. (§ 2782, subd. (a); see also § 1668.)

Finally, section 2778, unchanged since 1872, sets forth general rules for the interpretation of indemnity contracts, "unless a contrary intention appears." If not forbidden by other, more specific, statutes, the obligations set forth in section 2778 thus are deemed included in every indemnity agreement unless the parties indicate otherwise. Several subdivisions of this statute touch specifically on the indemnitor's obligations with respect to the indemnitee's defense against third party claims.

In this regard, the statute first provides that a promise of *indemnity* against claims, demands, or liability "embraces the *costs of defense* against such claims, demands, or liability" insofar as such costs are incurred reasonably and in good faith. (§ 2778, subd. 3, italics added.) Second, the section specifies that the indemnitor "is bound, on request of the [indemnitee], *to defend* actions or proceedings brought against the [indemnitee] in respect to the matters embraced by the indemnity," though the indemnitee may choose to conduct the defense. (*Id.*, subd. 4, italics added.) Third, the statute declares that if the indemnitor declines the indemnitee's tender of defense, "a recovery against the [indemnitee] suffered by him in good faith, is conclusive in his favor against the [indemnitor]." (*Id.*, subd. 5.) On the other hand, section 2778 provides, if the indemnitor got no reasonable notice of the action or was not allowed to control the indemnitee's defense, recovery by the third party against the indemnitee is only presumptive evidence against the indemnitor. (*Id.*, subd. 6.)

With these principles in mind, we examine the pertinent terms of Weather Shield's subcontract with JMP. We agree with the Court of Appeal majority that, even if strictly construed in Weather Shield's favor, these provisions expressly, and unambiguously, obligated Weather Shield to defend, from the outset, any suit against JMP insofar as that suit was "founded upon" claims *alleging* damage or loss arising from Weather Shield's negligent role in the Huntington Beach residential project. Weather Shield thus had a contractual obligation to defend such a suit even if it was later determined, as a result of this very litigation, that Weather Shield was not negligent.

We focus on the particular language of the subcontract. Its relevant terms imposed two distinct obligations on Weather Shield. First, Weather Shield agreed "to indemnify and save [JMP] harmless against all claims for damages to persons or to property and claims for loss, damage and/or theft . . . growing out of the execution of [Weather Shield's] work." Second, Weather Shield made a separate and specific promise "at [its] own expense *to defend any suit or action* brought against [JMP] *founded upon* the claim of such damage . . . loss, . . . or theft." (Italics added.)

A contractual promise to "defend" another against specified claims clearly connotes an obligation of active responsibility, from the outset, for the

promisee's defense against such claims. The duty promised is to render, or fund, the *service* of providing a defense on the promisee's behalf—a duty that necessarily arises as soon as such claims are made against the promisee, and may continue until they have been resolved. This is the common understanding of the word "defend" as it is used in legal parlance. (See, e.g., Black's Law Dict. (8th ed. 2004) p. 450, col. 2 ["2. To represent (someone) as an attorney . . ."]; Merriam-Webster's Collegiate Dict. (11th ed. 2004) p. 326, col. 1 ["3: to act as attorney for . . ."]; Random House Webster's College Dict. (2d rev. ed. 2001) p. 348, col. 2 ["4. to serve as attorney for (a defendant) . . ."]; American Heritage Dict. (4th ed. 2000) p. 475, col. 2 ["4. *Law* a. To represent (a defendant) in a civil or criminal action . . ."].)

■ A duty to defend another, stated in that way, is thus different from a duty expressed simply as an obligation to pay another, after the fact, for defense costs the other has incurred in defending itself. Section 2778, the statute governing the construction of all indemnity agreements, makes the distinction clear. On the one hand, as noted above, the section specifies that a basic contractual *indemnity* against particular claims, demands, or liabilities "embraces the costs of defense" against such claims, demands, or liabilities. (*Id.*, subd. 3.) On the other hand, the statute separately specifies the indemnitor's duty actually "to defend," upon the indemnitee's request, proceedings against the latter "in respect to the matters embraced by the indemnity," though "the person indemnified has the right to conduct such defenses . . . if he chooses to do so." (*Id.*, subd. 4.) Finally, section 2778 sets forth how the indemnitor's obligations will be affected if the indemnitor fails to accept an indemnitee's tender of defense or, alternatively, if the indemnitor is denied an opportunity to assume and control the defense. (*Id.*, subds. 5, 6.)[6]

---

[6] Pursuant to subdivision 5 of section 2778, if a contractual indemnitor declines the indemnitee's tender of defense of a third party claim against the latter, the third party's later judgment against the indemnitee may be conclusive evidence, against the indemnitor, of the indemnitee's liability to the third party, and the amount thereof, while the indemnitee's good faith settlement of the third party claim may be presumptive evidence against the indemnitor on that issue. (See, e.g., *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 [244 Cal.Rptr. 655, 750 P.2d 297]; *Peter Culley & Associates, supra,* 10 Cal.App.4th 1484, 1495–1497.) In other words, a contractual indemnitor's failure to assume the indemnitee's defense and, with it, control of the underlying litigation may restrict the indemnitor's later ability to separately litigate issues pertaining to its own *indemnity* liability. In this case, as indicated above, no issue is presented of the effect of JMP's settlement with the homeowners on Weather Shield's indemnity liability. We confront the separate question whether the express terms of Weather Shield's subcontract required Weather Shield, at its own expense, to assume JMP's defense, and, having failed to do so, to reimburse JMP after the fact for the latter's actual defense costs, *regardless* of Weather Shield's liability to indemnify JMP for amounts paid to the homeowners in settlement.

■ By virtue of these statutory provisions, the case law has long confirmed that, unless the parties' agreement expressly provides otherwise, a contractual indemnitor has the obligation, upon proper tender by the indemnitee, to accept and assume the indemnitee's active defense against claims encompassed by the indemnity provision. Where the indemnitor has breached this obligation, an indemnitee who was thereby forced, against its wishes, to defend itself is entitled to reimbursement of the costs of doing so.

Thus, in *Safeway Stores, Inc. v. Massachusetts Bonding & Ins. Co.* (1962) 202 Cal.App.2d 99 [20 Cal.Rptr. 820] (*Safeway Stores*), one King undertook, by written agreement, to act as general contractor in the construction of a new Safeway store. The agreement included King's obligation to indemnify Safeway against any claims, demands, or suits for damage, loss, or injury " 'result[ing] from or occur[ring] in connection with the performance of [the] contract.' " (*Id.,* at p. 105.) Construction workers employed by King sued Safeway for injuries they sustained when recently installed roof trusses collapsed. The workers alleged that Safeway had negligently permitted the installation of trusses it knew to be defective. King offered Safeway a defense, which Safeway initially accepted. However, it thereafter became apparent that the attorney furnished by King was serving King's conflicting interests; in discussions between the parties, King indicated he would deny indemnity liability if Safeway was found negligent. Safeway thereupon retained its own attorney to defend the workers' action, and later sought reimbursement of its defense costs from King.

The Court of Appeal agreed with Safeway. The court noted that "under the contract of indemnity, no contrary intention appearing, *King was bound to defend the actions.* (Civ. Code, § 2778, subd. 4.)" (*Safeway Stores, supra,* 202 Cal.App.2d 99, 114, italics added.) However, the court reasoned, in light of the obvious conflict between Safeway's litigation interests and King's position on the indemnity issue, Safeway had reasonably inferred that, despite King's technical proffer, King did not intend to honor his contractual obligation to provide Safeway with a complete defense. Under these circumstances, the court concluded, Safeway did not act as a volunteer in assuming its own defense, and was entitled to reimbursement for King's breach of the duty to defend.

Similarly, in *Buchalter v. Levin* (1967) 252 Cal.App.2d 367 [60 Cal.Rptr. 369], the court acknowledged that subdivision 4 of section 2778 "establishes an indemnitor's obligation to *defend* the indemnitee *upon request, even though the indemnity agreement does not expressly so provide . . . ."* (*Buchalter, supra,* at p. 374, italics added.) However, the court concluded, the subdivision's provision that the indemnitee may "conduct his own defense 'if he chooses to do so' " (*ibid.*) does not mean the indemnitee ordinarily may

refuse the indemnitor's good faith proffer of a complete defense, then still collect reimbursement from the indemnitor for the defense costs the indemnitee has voluntarily incurred. (*Id.,* at pp. 374–375; cf. *Goodman v. Severin* (1969) 274 Cal.App.2d 885, 897 [79 Cal.Rptr. 555].)

In *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A. G.* (1970) 3 Cal.3d 434 [91 Cal.Rptr. 6, 476 P.2d 406] (*Gribaldo*), a majority of this court carefully distinguished between the "costs of defense" described in subdivision 3 of section 2778, on the one hand, and the duty "to defend" the indemnitee, as set forth in subdivision 4 of the statute, on the other. There, an errors and omissions indemnity policy provided for a deductible of $2,500, said nothing about a duty to defend, gave the underwriters the *right* to assume the insureds' defense, specified that the insureds need not contest any legal claim unless counsel mutually chosen by the parties advised otherwise, and prohibited either party from settling a claim against the insureds without the other's consent. The policy further stated that if the insureds refused a settlement offer against the underwriters' recommendation, and elected to contest the claim further, the underwriters' liability would not exceed the amount for which the claim could have been settled, plus costs and expenses incurred by the insureds with the underwriters' consent.

After the insureds settled a third party claim, they sought declaratory relief against the underwriters on the issue of liability for defense costs. The insureds contended that under subdivision 4 of section 2778, the policy included, and the underwriters had breached, an "actual duty to defend" (*Gribaldo, supra,* 3 Cal.3d 434, 441) any claim, of a type covered by the policy, in which the *initial demand* exceeded the $2,500 deductible. Hence, the insureds insisted, the underwriters were now obliged to pay the insureds' costs of defending such claims in full, regardless of the amounts for which the claims were actually resolved.

The trial court disagreed. It reasoned that, under the particular terms of the policy, the underwriters were not obliged to defend the insureds. Hence, the court concluded, any liability of the underwriters for the insureds' defense costs arose solely under subdivision 3 of section 2778, as part of any indemnity the underwriters otherwise owed the insureds. That obligation, the court held, applied only to costs incurred by the insureds to defend claims "embraced within the provisions of the policy, that is, those claims in excess of $2,500 actually paid by [the insureds]." (*Gribaldo, supra,* 3 Cal.3d 434, 441.)

This court affirmed. The majority agreed "that under the provisions of subdivision 4 of section 2778 the indemnitor is required to defend matters embraced by the indemnity if . . . requested to do so by the indemnitee." (*Gribaldo, supra*, 3 Cal.3d 434, 448.) However, the majority noted, the policy at issue indicated a contrary intent, as section 2778 permits. By its plain terms, the policy *allowed* the underwriters, at *their option*, to assume the insureds' defense, and it "require[d] [the insureds] to defend claims where so advised by counsel." (3 Cal.3d at p. 448.) Moreover, the majority noted, even assuming the policy did not, at the outset, exclude a duty to defend, the insureds had, contrary to the policy, incurred defense costs without first obtaining the underwriters' consent, and had failed, as required by subdivision 4 of section 2778, to *request* a defense. (*Gribaldo, supra*, at pp. 448–449.)

Accordingly, the majority reasoned, the underwriters had breached no duty under subdivision 4 of section 2778 to defend any and all claims in which the demand exceeded the $2,500 deductible. Instead, the majority concluded, the trial court had acted correctly in calculating the underwriters' defense-cost liability under subdivision 3 of the statute. Under the latter provision, the majority held, the underwriters' defense-cost liability was limited to the insureds' expense of defending claims as to which the underwriters otherwise owed indemnity—i.e., those claims actually paid by the insureds in amounts exceeding the $2,500 deductible. (*Gribaldo, supra*, 3 Cal.3d 434, 447–450.)

Recently, *City of Watsonville v. Corrigan* (2007) 149 Cal.App.4th 1542 [58 Cal.Rptr.3d 458] observed once again that subdivision 4 of section 2778 "describes the indemnitor's duty to *defend* . . . actions or proceedings brought against the indemnitee if the latter requests the defense." (*City of Watsonville, supra*, at p. 1549, original italics.) However, the Court of Appeal held that by failing to request a defense, or to notify the indemnitor of the third party action, and by unilaterally deciding to conduct its own defense, the indemnitee does not necessarily forfeit its contractual right to reimbursement of its defense *costs* under the *indemnity* provisions of subdivision 3 of the statute.

Thus, as these decisions indicate, subdivision 4 of section 2778, by specifying an indemnitor's duty "to defend" the indemnitee upon the latter's request, places in every indemnity contract, unless the agreement provides otherwise, a duty to assume the indemnitee's defense, if tendered, against all claims "embraced by the indemnity." The indemnitor's failure to assume the duty to defend the indemnitee upon request (§ 2778, subd. 4) may give rise to damages in the form of reimbursement of defense costs the indemnitee was

thereby forced to incur. But this duty is nonetheless distinct and separate from the contractual obligation to pay an indemnitee's defense costs, after the fact, as part of any indemnity owed under the agreement. (*Id.,* subd. 3.)

 Implicit in this understanding of the duty to defend an indemnitee against all claims "embraced by the indemnity," as specified in subdivision 4 of section 2778, is that the duty arises immediately upon a proper tender of defense by the indemnitee, and thus before the litigation to be defended has determined whether indemnity is actually owed. This duty, as described in the statute, therefore cannot depend on the outcome of that litigation. It follows that, under subdivision 4 of section 2778, claims "embraced by the indemnity," as to which the duty to defend is owed, include those which, at the time of tender, *allege* facts that would give rise to a duty of indemnity.[7] Unless the indemnity agreement states otherwise, the statutorily described duty "to defend" the indemnitee upon tender of the defense thus extends to all such claims.

Here, the subcontract at issue not only failed to limit or exclude Weather Shield's duty "to defend" JMP, as otherwise provided by subdivision 4 of section 2778, it confirmed this duty. In language similar to that of the statute, the subcontract explicitly obligated Weather Shield both to *indemnify* JMP against certain claims, and "at [its] own expense *to defend*" JMP against "any suit or action . . . founded upon" such claims. (Italics added.) The duty "to defend" expressly set forth in Weather Shield's subcontract thus clearly contemplated a duty that arose when such a claim was made,[8] and was not dependent on whether the very litigation to be defended later established Weather Shield's obligation to pay indemnity.

Moreover, the subcontract at issue included a further express indication that the express duty "to defend" actions against JMP was not strictly limited to those claims on which, in the end, Weather Shield actually owed indemnity. The indemnity and defense clauses of the subcontract contained linguistic differences that conform to the logical distinctions between the two duties. On the one hand, the subcontract obligated Weather Shield to "indemnify . . . [JMP] . . . against" all claims for injury, damage, loss, or theft arising from performance of the subcontract, while, on the other, it required Weather

---

[7] We do not suggest that the indemnitor's duty to defend would *continue* even if, during the progress of the third party proceeding against the indemnitee, all claims potentially subject to the contractual indemnity obligation were eliminated, or if the promisor otherwise conclusively established that the claims were not among those "embraced by the indemnity" (§ 2778, subd. 4). Such issues are not before us, and we express no views thereon.

[8] Unlike subdivision 4 of section 2778, Weather Shield's subcontract did not expressly condition the duty "to defend" upon the indemnitee's *request* for a defense. In any event, as noted above (fn. 2, *ante*), Weather Shield does not contend it was absolved of a duty to defend on account of any failure by JMP to make such a request.

Shield "to defend *any suit or action . . .* against [JMP] *founded upon* the claim" of such injury, damage, loss, or theft. (Italics added.)

 One can only indemnify against "claims for damages" that have been resolved against the indemnitee, i.e., those as to which the indemnitee has actually sustained liability or paid damages. Indemnification, after all, is the act of saving another from the legal *consequence* of an act. (§ 2772.) Hence, a clause requiring Weather Shield to indemnify JMP "against" defined claims clearly indicated that the indemnity obligation would apply only if JMP ultimately incurred such a legal consequence as a result of covered claims.

By contrast, as noted above, the subcontract required Weather Shield "to defend" JMP against *"any suit or action . . . founded upon* the claim of such damage . . . ." (Italics added.) Under this language, the duty to defend arose, as it logically must, as soon as a "suit or action" was brought against JMP that was "founded upon" a covered claim, i.e., that asserted a claim within the coverage of both clauses. Necessarily, a duty expressed in this manner did not require a final determination of the issues, including the issue of Weather Shield's negligence, before Weather Shield was required to mount and finance a defense on JMP's behalf.

The Court of Appeal majority so concluded. Dissenting on this point, Justice O'Leary conceded at the outset that "the word 'defend,' as defined in the abstract, would ordinarily mean providing legal services for a pending claim." Nonetheless, she stressed, noninsurance indemnity contracts, unlike liability insurance policies, are construed to limit the obligations imposed, and the duties undertaken must be stated with particular clarity and specificity. Examined in that light, she asserted, Weather Shield's subcontract did not make absolutely clear that Weather Shield's duty to defend, unlike its duty to indemnify, arose regardless of its negligence.

To conclude that, absent greater specificity, the indemnity and defense obligations stated in the subcontract both required a finding of Weather Shield's negligence, Justice O'Leary reasoned as follows: The indemnity and defense obligations in Weather Shield's subcontract were "described in a single sentence" with two clauses. The first clause, stating the indemnity obligation, covered " 'claims for damages . . . growing out of the execution of [Weather Shield's] work . . . .' Everyone (the litigants, trial court, and majority) seems to agree [that] matters embraced by this indemnity clause [were] narrowly limited to damages *caused* by [Weather Shield's] own

*negligent* work on the project." (Original italics.) The second clause, defining the defense duty, confined that responsibility to suits or actions founded upon " 'the claim of such damage . . . .' The qualifying phrase, 'claim of such damage' clearly refer[red] to the earlier language limiting the scope of claims embraced by the indemnity, i.e., 'all claims for damages . . . growing out of the execution of the work[.]' Therefore, both obligations appear to be dependent on the same coverage terms."

But Justice O'Leary's analysis overlooks the clear differences in the two clauses that we have described above. In particular, Weather Shield's express contractual duty to defend suits "founded upon" the kinds of claims specified in the agreement necessarily extended to suits that *alleged* such claims, not just suits in which they were proven. Assuming, as we must, that Weather Shield's subcontract obligated it to indemnify JMP against claims arising from Weather Shield's negligent performance of the subcontract, it follows that Weather Shield's contractual duty to defend JMP encompassed suits or actions that alleged such negligence on Weather Shield's part. Weather Shield could not avoid this duty on the ground that the very litigation to be defended might later result in a finding Weather Shield was, in fact, not negligent.

Parties to an indemnity contract can easily disclaim any responsibility of the indemnitor for the indemnitee's defense, or the costs thereof. Short of that, they can specify that the indemnitor's sole defense obligation will be to reimburse the indemnitee for costs incurred by the latter in defending a particular claim. However, the instant subcontract did neither. On the contrary, it specified that Weather Shield would be required, "at [its] own expense," to "defend" JMP against suits "founded upon" claims arising from Weather Shield's performance of its subcontract. This language indicated a more immediate obligation, one that would necessarily arise before the litigation to be defended could determine whether Weather Shield owed indemnity to JMP.

In arguing otherwise, Weather Shield relies heavily on *Heppler, supra,* 73 Cal.App.4th 1265. There, in connection with another of JMP's large residential construction projects, Mueller-Lewis Concrete (Mueller) signed a JMP-drafted subcontract containing indemnity and defense clauses identical to those at issue here. Homeowners sued JMP, Mueller, and others for construction defects. Mueller declined JMP's tender of defense. In a global settlement, JMP assigned its contractual rights against Mueller to the plaintiff homeowners. As JMP's assignees, they sought to recover against Mueller under both the indemnity and defense provisions. The defect, indemnity, and defense issues went to trial against Mueller. The trial court ruled that the plaintiffs must prove negligence and causation against Mueller in order to trigger Mueller's contractual indemnity obligations. The jury returned a general verdict for Mueller.

On appeal, the plaintiffs challenged the lower court's ruling that Mueller's negligence was a prerequisite to its contractual duty of indemnity. The Court of Appeal affirmed the judgment in Mueller's favor. For a number of reasons, the court concluded that the language of the subcontract triggered Mueller's indemnity obligation only if Mueller itself was found negligent. (*Heppler, supra,* 73 Cal.App.4th 1265, 1275–1281.)[9]

However, the plaintiffs in *Heppler* did not contend that, even if the indemnity clause in Mueller's subcontract was triggered only by Mueller's actual negligence, the duty-to-defend clause applied more broadly. Accordingly, the *Heppler* court never separately addressed the defense clause of the subcontract, or considered how the particular language of that clause might distinguish it from the indemnity clause. In affirming the general verdict for Mueller, the court simply assumed that the indemnity and defense provisions of the subcontract were congruent.[10]

Here, by contrast, we directly confront the relationship, and the distinctions, between the two clauses. Upon examination, as explained above, their language differs in a way suggesting that, even if the indemnity obligation is triggered only by an ultimate finding of the indemnitor's fault, the defense obligation applies before, and thus regardless of, any finding to be made in the course of the litigation for which a defense is owed. Hence, whatever *Heppler*'s merits on the issues actually considered in that case, we do not find the decision helpful or persuasive on the narrow question before us.

Similarly, *Goldman, supra,* 62 Cal.2d 40, cited by Weather Shield, is of little use in construing the particular defense clause at issue in this case. Our opinion *noted* a duty-to-defend clause, phrased in language different from that we address here, that might bind the subcontractor in that case. (See *id.,* at

---

[9] This aspect of the ruling in *Heppler, supra,* 73 Cal.App.4th 1265, may be what has dissuaded the homeowners in this case, acting in JMP's stead, from challenging on appeal the trial court's ruling that the identical indemnity clause in Weather Shield's subcontract required Weather Shield's negligence as a condition of its indemnity liability.

[10] This assumption is confirmed by *Baldwin Builders v. Coast Plastering Corp.* (2005) 125 Cal.App.4th 1339 [24 Cal.Rptr.3d 9], where the same Court of Appeal panel broadly stated the holding of *Heppler* as being that "an indemnitor/subcontractor generally will not be liable *or have a duty to defend its general contractor* pursuant to the terms of an indemnity agreement unless it was negligent in performing its work under the subcontract." (*Baldwin Builders, supra,* at p. 1347, italics added.) But this passage in *Baldwin Builders* is dictum; the case had nothing to do with an indemnitor's duty, regardless of fault, to defend its indemnitee. The sole question was whether, having proved in the underlying construction defect litigation that it was not negligent, and thus owed no indemnity under the terms of its subcontract, the subcontractor/indemnitor could recover, under the contractual attorney-fee reciprocity statute (§ 1717, subd. (a)), its attorney fees incurred in so establishing. The Court of Appeal concluded that the answer was yes, reasoning that these were fees expended by the subcontractor/indemnitor to enforce the indemnity agreement itself, i.e., to prove that it owed no contractual indemnity.

pp. 42–43, fn. 2). We also indicated that the indemnitee had demanded both indemnity and a defense from the subcontractor. (*Id.*, at p. 42.) However, our decision addressed only the subcontractor's duties under the separate indemnity clause at issue in the case. Our holding was simply that if one seeks contractual indemnity protection for his or her own active negligence, the language providing such protection must be particularly clear and explicit. (*Id.*, at p. 44.) Here, upon close examination of Weather Shield's subcontract, we find it did clearly and explicitly create a defense duty not dependent on the ultimate resolution of issues, such as Weather Shield's fault, that would only be determined after the duty arose.

Nor, under close examination, is *Mel Clayton Ford, supra,* 104 Cal.App.4th 46, helpful to Weather Shield's cause. Weather Shield suggests *Mel Clayton Ford* stands for the proposition that a duty-to-defend clause in a noninsurance agreement does not extend to mere allegations that would trigger an indemnity obligation only if proven. We do not so interpret the decision. In our view, Weather Shield takes out of context the passage on which it relies.

In *Mel Clayton Ford*, an agreement between a vehicle manufacturer and its retail dealer specified that the manufacturer would defend and indemnify the dealer against any third party suits, complaints, or claims " 'concerning . . . injury or . . . damage arising out of an occurrence caused *solely* by' " a manufacturing or design defect in a vehicle supplied to the dealer by the manufacturer. (*Mel Clayton Ford, supra,* 104 Cal.App.4th 46, 49, italics added.) Thus, the manufacturer excluded from its defense obligation any suit or claim that alleged dealer negligence, or any theory other than manufacturing or design defect, as a sole or contributing cause of the injury or damage.

'In 1989, the plaintiff purchased from the dealer a truck supplied by the manufacturer. Thereafter, the dealer performed maintenance on the vehicle. In 1997, while the plaintiff was driving the truck, it burst into flames, seriously injuring him. He sued both the manufacturer and the dealer, alleging not only a defectively designed and manufactured product, but also claims based on failure to warn, breach of warranty, and " 'theories of [the dealer's] direct or active negligence in the maintenance of the vehicle.' " (*Mel Clayton Ford, supra,* 104 Cal.App.4th 46, 50.)

The Court of Appeal held that the manufacturer had no duty to undertake the dealer's defense under such circumstances. This was because "[t]he indemnity provision required [the manufacturer] to defend the Dealer only where the occurrence was caused *solely* by a production defect, and not

whenever product liability was *one of the allegations* of the underlying complaint." (*Mel Clayton Ford, supra,* 104 Cal.App.4th 46, 55, second italics added.)

Thus, in *Mel Clayton Ford,* it was not an allegations-versus-proof distinction that negated the duty to defend. Rather, given the word "solely" in the indemnity/defense clause there at issue, the crucial fact was that the suit for which a defense was sought included allegations *other than* those to which the manufacturer had limited its defense duty—design or production defects attributable to the manufacturer itself.[11]

Here, Weather Shield's contractual duty was not similarly limited. Weather Shield promised to defend JMP against any suit "founded upon" a "claim of . . . damage" "growing out of the execution of [Weather Shield's] work." The contract did not specify, or even hint, that no defense duty would exist unless the suit was *solely* concerned with Weather Shield's performance under its own subcontract and included no other claims or allegations. Nor does Weather Shield so claim. Hence, nothing decided in *Mel Clayton Ford* establishes that until Weather Shield's faulty performance of its work was proven, it had no duty to defend JMP.

Finally, we are not persuaded by *Regan Roofing, supra,* 24 Cal.App.4th 425, insofar as that decision suggests that a contractual duty to defend specified classes of claims, expressed in such terms, necessarily depends on the promisor's ultimate liability for indemnity on those claims.

In *Regan Roofing,* after a housing developer, Pacific Scene, was sued for construction defects, it cross-complained against numerous project subcontractors to establish its contractual indemnity and defense rights. Each of these agreements required the subcontractor to indemnify Pacific Scene against all mechanic's liens related to the subcontractor's work, as well as " 'any other liability, cost or expense of any nature or kind arising out of or in any way connected with Subcontractor's performance . . . , save and except only such liability, cost or expense caused by [Pacific Scene's] sole negligence or sole willful misconduct.' " (*Regan Roofing, supra,* 24 Cal.App.4th at p. 430, italics omitted.) " 'Pursuant to . . . the foregoing,' " the subcontracts declared, " 'Subcontractor shall indemnify and hold harmless [Pacific Scene] from any costs and expenses for attorney's fees . . . resulting to [Pacific Scene] from such claims or liens.' " (*Ibid.,* italics omitted.) Finally, each agreement separately provided that " '[i]n the event any suit on any claim is

---

[11] To the extent there is any ambiguity in *Mel Clayton Ford*'s holding on this point, it cannot be resolved by further examination of the Court of Appeal's opinion in that case. Except for the summary passage quoted above, the Court of Appeal's discussion of this interpretive issue appeared in the unpublished portion of its partially published opinion.

brought against [Pacific Scene], subject to the provision, Subcontractor shall defend said suit at Subcontractor's own cost and expense . . . .' " (*Ibid.*, italics omitted.)

Pacific Scene sought pretrial summary adjudication of a number of issues, including rulings on the subcontractors' duties to indemnify and defend. The trial court determined that the indemnity provision of the subcontracts included coverage for Pacific Scene's own negligence. However, the court found that the question whether the subcontractors actually owed indemnity was premature, because, among other things, Pacific Scene had not yet incurred liability or paid claims subject to indemnity. On the other hand, the court concluded, under the language of the agreements and section 2778, each subcontractor did have an immediate duty to defend claims " 'brought against [Pacific Scene] in respect to matters embraced by the indemnity clause.' " (*Regan Roofing, supra*, 24 Cal.App.4th 425, 432.)

The Court of Appeal reversed on the latter point. The appellate court indicated that "summary adjudication of the duty to defend and its relationship to the duty to indemnify (i.e., the scope of 'the matters embraced by the indemnity') is premature. No determination has yet been made as to whether the subcontractors were negligent in the performance of their work, giving rise to a duty to indemnify *and a related duty to defend*. Pacific Scene has not clearly established that under this indemnity clause, the duty to defend against claims of liability is entirely free-standing of the duty to indemnify for liability arising out of a subcontractor's negligence. [Citation.]" (*Regan Roofing, supra*, 24 Cal.App.4th 425, 436, italics added.)

In reaching this conclusion, however, the Court of Appeal erred. The court seems to have assumed that, under subdivision 4 of section 2778, and unless the agreement at issue clearly provides otherwise, an indemnitor's duty to defend the indemnitee upon request in matters "embraced by the indemnity" is not, in the court's words, "free-standing," but extends only to claims as to which indemnity is actually owed. (*Regan Roofing, supra*, 24 Cal.App.4th 425, 436.) And the court found no such explicit contrary intent in the subcontracts there under consideration.

However, as we have explained, the duty to defend upon the indemnitee's request, as set forth in subdivision 4 of section 2778, *is* distinct from, and broader than, the duty expressed in subdivision 3 of the statute to reimburse an indemnitee's defense costs as part of any indemnity otherwise owed. Moreover, the subcontracts at issue in *Regan Roofing*, like the one before us here, did explicitly indicate a separate and distinct duty to defend the indemnitee, at the indemnitor's own cost and expense, against *suits raising claims* covered by the indemnity. That duty—like Weather Shield's in this

case—necessarily arose when such a claim was made against the indemnitee, and thus did not depend on whether the conditions of indemnity were, or were not, later established.

*Regan Roofing* was therefore mistaken insofar as it concluded that, under the agreements there at issue, the subcontractors' defense duties arose only if the subcontractors became liable for indemnity. We will disapprove the *Regan Roofing* decision to that extent.[12]

Weather Shield and its amici curiae raise numerous, and substantial, policy concerns about an indemnity agreement that requires a subcontractor to defend a residential developer or builder in a construction defect suit before, and regardless of whether, the subcontractor itself is found to be at fault. Arguments asserted include the following: Large builders and developers use their superior bargaining power, and self-drafted contract terms, unfairly to shift the financial consequences of their own legal liability to faultless subcontractors, who are not compensated for the risk and agree only because

---

[12] We realize that *Regan Roofing*'s finding of prematurity was also substantially influenced by the practical difficulties of sorting out multiple, and potentially conflicting, duties to assume the active defense of litigation then in progress. (See *Regan Roofing, supra*, 24 Cal.App.4th 425, 437.) Weather Shield and its amici curiae raise similar concerns. But the case before us does not present such problems. JMP cross-complained against Weather Shield and other subcontractors on indemnity and duty-to-defend issues, but the trial on these issues was postponed until after most of the subcontractors had settled with JMP, and after the underlying construction defect litigation against the remaining parties, including Weather Shield, was concluded. Thus, while the trial court correctly held that Weather Shield's contractual duty to defend *arose* when a suit *alleging* covered claims was brought against JMP, and that the duty thus did not depend on whether the conditions for indemnity were later established, the court was able to assess *after the fact* Weather Shield's proportionate liability for breach of its duty to defend.

The instant parties apparently saw no impropriety in this procedure, and neither do we. At least with respect to pre-2006 residential construction subcontracts, and subject to any future contrary or inconsistent legislation, the following procedures seem appropriate: When a party sues one or more other persons, seeking to establish a contractual right to a defense against litigation not yet concluded, these issues may, if the parties agree, be deferred until the underlying litigation is complete. If any party moves for summary judgment or adjudication (Code Civ. Proc., § 437c) with respect to the duty to defend against litigation still in progress, the court may proceed as it deems expedient. For example, the court may resolve legal issues then ripe for adjudication, such as whether any of the contracts at issue include a duty to defend, and, if so, whether the underlying suit or proceeding as to which a defense is sought falls within the scope of any of the parties' contractual duty to defend. If the court finds that an ongoing duty to defend is owed by one or more parties, but the affected parties, acting in good faith, then cannot agree on how such a defense should be provided or financed, the court may, in its discretion, permit the underlying litigation to proceed with counsel chosen and paid by the party to whom the duty is owed, subject to a later determination of how damages for breach of the duty to defend should be apportioned among the breaching parties.

they need the work.[13] Such shifting discourages builders and developers themselves from taking proper care in construction oversight. Small subcontractors, moreover, lack the resources to fund a developer's defense "up front" while often simultaneously defending themselves in the same lawsuit, where the developer typically pursues the hostile and conflicting strategy of pinning blame on them. The developer can demand a defense from a single subcontractor among many, and the latter may later be unable to obtain contribution from other subcontractors. Further, subcontractors, unlike liability insurers, lack defense attorney "panels" available at favorable fee rates. Because of privilege and conflict-of-interest issues, they may also lack access to the developer's attorney billing records. As a result, a subcontractor may be forced to pay exorbitant and unreasonable legal costs for the developer's defense. Finally, the vagaries of construction defect litigation in California have caused many insurers to leave the market. Thus, and contrary to the Court of Appeal's assumption, "backup" insurance to cover subcontractors' contractual defense burdens is not readily available at reasonable cost.

As Weather Shield and its amici curiae point out, statutes effective January 1, 2006, and January 1, 2008, respectively, were adopted to address just such concerns. These new laws, which apply to residential construction contracts entered *after* their effective dates, void any term in such a contract that obliges a subcontractor to indemnify certain other project participants, "including the cost to defend," against construction defect claims "to the extent" the claims "arise out of, pertain to, or relate to" the negligence of those other entities. (§ 2782, subds. (c), (d), as added by Stats. 2005, ch. 394, § 1; see § 2782, subd. (e), as added by Stats. 2007, ch. 32, § 1.)[14] However, Weather Shield and its amici curiae assert that, unless we hold otherwise, California's 10-year

---

[13] By noting this argument, we do not dismiss the possibility that in many instances, subcontractors may *prefer* to assume, and control, the defense of suits against builders, developers, or other contractors, especially when the claims raised may expose the subcontractors themselves to direct or indirect liability.

[14] As noted above, section 2782, subdivision (a) has long provided that a party to a construction contract cannot agree to indemnify another project participant for the latter's *sole* negligence or willful misconduct. Subdivision (c) of section 2782, as adopted in 2005 and slightly amended in 2007, additionally provides in pertinent part: "For all construction contracts, and amendments thereto, entered into after January 1, 2006, for residential construction . . . , all provisions, clauses, covenants, and agreements contained in, collateral to, or affecting any construction contract, and amendments thereto, that purport to indemnify, including the cost to defend, the builder . . . by a subcontractor against liability for claims of construction defects are unenforceable to the extent the claims arise out of, pertain to, or relate to the negligence of the builder or the builder's other agents, other servants, or other independent contractors who are directly responsible to the builder, or for defects in design furnished by those persons . . . . This section shall not be waived or modified by contractual agreement, act, or omission of the parties. Contractual provisions, clauses, covenants, or agreements not expressly prohibited herein are reserved to the agreement of the parties."

Subdivision (d) of section 2782, also adopted in 2005 and effective January 1, 2006, provides in pertinent part: "Subdivision (c) does not prohibit a subcontractor and builder from

statute of limitations for construction defects (Code Civ. Proc., § 337.15) still exposes numerous subcontractors who signed earlier agreements to unfair and burdensome defense demands by developers.

In effect, Weather Shield and its amici curiae ask us to conclude as a matter of law that, in a pre-2006 residential construction contract, a term which expressly obliges a subcontractor "to defend" a builder, developer, or general contractor against claims "founded upon" the subcontractor's negligent work, but says nothing further about the scope of the duty, means only that the subcontractor must *reimburse* the promisee, after the fact, for the promisee's legal expenses as part of any *indemnity* ultimately owed by the subcontractor to the promisee. They suggest that to produce a contrary result, the subcontract should say, in so many words, that the duty to defend arises immediately when a claim is asserted against the promisee, is not limited to later reimbursement of the promisee's legal expenses, and applies regardless, and independent, of any duty of indemnity for which the subcontractor may later become liable.

We are sensitive to the policy issues raised by Weather Shield and its amici curiae. Nonetheless, for reasons stated at length above, we decline the holding they propose. Even applying the rule of strict construction they espouse, the instant contract already sets forth, in unambiguous terms, an immediate and independent duty to defend. As we have indicated, an express promise "to defend" another against claims "founded upon" the promisor's acts or omissions *inherently* incorporates the characteristics they insist must be set forth in additional explicit terms. And if the parties intended only to give the indemnitee a right to after-the-fact reimbursement of its legal expenses as a component of any indemnity otherwise owed by the indemnitor, they would need no language to say so. That right is already included in every indemnity contract, unless otherwise specifically provided, under subdivision 3 of section 2778.[15]

mutually agreeing to the timing or immediacy of the defense and provisions for reimbursement of defense fees and costs, so long as that agreement, upon final resolution of the claims, does not waive or modify the provisions of subdivision (c)."

Subdivision (e) of section 2782, as added in 2007 and effective for residential construction contracts entered after January 1, 2008, uses parallel language to expand the categories of project participants as to whom a subcontractor cannot be made contractually responsible for construction defect indemnity, including defense costs, "to the extent" such claims "arise out of, pertain to, or relate to" the negligence of those entities or their agents, their servants, or the independent contractors directly responsible to them. Under subdivision (e), the categories of project participants who may not obtain such contractual indemnity from a subcontractor now include not only the builder, but also "the general contractor or contractor that is not affiliated with the builder."

[15] Amicus curiae Jeld-Wen, Inc., suggests "[t]here is good reason to believe" that section 2778's reference to "contract[s] of indemnity" was never intended to apply to anything but

Finally, Weather Shield does not suggest that, as applied to it, the subcontract was either procedurally or substantively unconscionable. Nor does Weather Shield otherwise imply that it is a relatively small and powerless subcontractor overwhelmed by JMP's superior bargaining power. Furthermore, Weather Shield does not claim it naively signed the instant subcontract without understanding the terms. Indeed, in its opening brief, Weather Shield describes itself as "the out-of-state manufacturer of the . . . wood windows" installed in the Huntington Beach residential development—a development that included at least 122 homes. This description suggests a multistate scale of operations, and a consequent sophistication, that would undermine any such assertions.[16]

We therefore conclude that the duty "to defend" JMP against claims "founded upon" damage or loss caused by Weather Shield's negligent performance of its work, as set forth in Weather Shield's subcontract, imposed such duties on Weather Shield as soon as a suit was filed against JMP that asserted such claims, and regardless of whether it was ultimately determined that Weather Shield was actually negligent. Accordingly, we affirm the judgment of the Court of Appeal.

---

insurance contracts. Jeld-Wen notes that section 2778, adopted in 1872, traces its lineage to a similar 1865 New York statute which also used that term. This nomenclature, Jeld-Wen asserts, was commonly employed in the mid-19th century to refer to insurance contracts. Jeld-Wen further notes that early cases interpreting the 1865 New York law all concerned bonds or insurance policies. We reject the contention for several reasons. First, section 2778, governing "contract[s] of indemnity," appears in a portion of the Civil Code (title 12 of part 4 of division 3, commencing with section 2772) simply entitled "Indemnity." Section 2772 defines "indemnity" as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." That definition is not confined to insurance agreements. Second, this same title includes a number of statutes that expressly apply to the indemnity provisions of *noninsurance* contracts. (See, e.g., §§ 2782–2784 [construction contracts], 2784.5 [hauling, trucking, or cartage contracts].) Third, California cases too numerous to mention have assumed, virtually since the inception of section 2778, that it applies to indemnity agreements outside the insurance context. (See, e.g., *Davis v. Air Technical Industries, Inc.* (1978) 22 Cal.3d 1, 6, fn. 6 [148 Cal.Rptr. 419, 582 P.2d 1010]; *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 41, fn. 9 [69 Cal.Rptr. 561, 442 P.2d 641]; *Eva v. Andersen* (1913) 166 Cal. 420, 424–425 [137 P. 16]; *Showers v. Wadsworth* (1889) 81 Cal. 270, 273–274 [22 P. 663]; *Peter Culley & Associates, supra,* 10 Cal.App.4th 1484, 1494–1496; *Buchalter v. Levin, supra,* 252 Cal.App.2d 367, 371–375.) The Legislature has never indicated otherwise. No reason appears to disturb this settled construction.

[16] Questioned on this subject at oral argument, Weather Shield's counsel did not deny that Weather Shield is a sizeable multistate purveyor of manufactured windows.

## CONCLUSION

The judgment of the Court of Appeal is affirmed. The decision in *Regan Roofing Co. v. Superior Court, supra*, 24 Cal.App.4th 425, is disapproved to the extent it conflicts with the conclusions set forth in this opinion.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.