Filed 7/19/13  TetraVue v. St. Paul Fire & Marine Casualty Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| TETRAVUE, INC. et al.,<br><br>        Plaintiffs and Appellants,<br><br>        v.<br><br>ST. PAUL FIRE & MARINE INSURANCE COMPANY,<br><br>        Defendant and Respondent. | D061002<br><br><br>(Super. Ct. No.<br> 37-2011-00086115-CU-IC-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge.  Reversed.

Techmark Greenstein Law, Neil David Greenstein; Joseph A. Hearst for Plaintiffs and Appellants.

McKenna Long & Aldridge, John T. Brooks and Peter H. Klee for Defendant and Respondent.

# I.

## INTRODUCTION

Plaintiffs TetraVue, Inc. (TetraVue) and Paul Banks appeal from a judgment entered in favor of defendant St. Paul Fire & Marine Insurance Company (St. Paul) after the trial court granted St. Paul's motion for summary judgment and denied the plaintiffs' cross-motion for summary judgment. TetraVue and Banks sued St. Paul in a declaratory relief action, seeking a determination that St. Paul owed them a duty of defense in an underlying lawsuit against Banks and TetraVue brought by third party General Atomics by way of a cross-complaint in an action that Banks originally filed against General Atomics. TetraVue and Banks contended that the General Atomics cross-complaint raised claims that were potentially covered by the property damage provision and/or the advertising injury provision of a general liability policy that TetraVue had purchased from St. Paul. The plaintiffs and St. Paul filed cross-motions for summary judgment. The trial court granted St. Paul's motion for summary judgment and denied TetraVue and Banks's joint motion for summary judgment after determining that there was no potential for coverage of the claims under either the property damage provision or the advertising injury provision. The court thereafter granted judgment in favor of St. Paul.

On appeal, TetraVue and Banks argue that the trial court erred in entering judgment in favor of St. Paul because General Atomics's cross-complaint suggests a claim that is potentially covered by the St. Paul policy under the coverage for advertising injury. We conclude that TetraVue and Banks demonstrated the existence of a potential for coverage under the policy under the advertising injury provision, and that St. Paul

2

failed to establish the absence of any potential for coverage. St. Paul thus had a duty to defend TetraVue and Banks in the underlying action. We therefore reverse the judgment of the trial court, and direct the trial court to enter judgment in favor of TetraVue and Banks.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Banks was employed by General Atomics from June 2000 until July 11, 2008. Banks is a laser researcher who worked in the Photonics Division of General Atomics, where he helped the company develop a sophisticated laser technology that is now used by the United States government. According to Banks, while he was employed at General Atomics, he was interested in adapting the laser technology for commercial use. It appears that at some point, Banks and General Atomics disagreed as to how, or whether, to pursue nongovernmental applications of the technology, and in July 2008, Banks resigned from General Atomics.

In May 2008, prior to leaving General Atomics, Banks founded and incorporated TetraVue. Banks is the president and CEO of the company.

Banks attempted to reach, and believed that he had reached, a license agreement between General Atomics and TetraVue that would enable TetraVue to use materials and technology from General Atomics. Pursuant to this belief, Banks took certain materials from General Atomics when he left.

3

In February 2009, Banks sued General Atomics for fraud and breach of contract. Banks alleged that General Atomics had promised to provide him with an ownership interest in its Photonics Division, and that it had refused to provide him with that interest.

In October 2009, TetraVue was accepted to be part of a startup incubator and was required to obtain liability coverage in order to participate in the incubator program. TetraVue applied for a liability insurance policy from St. Paul in early November 2009. The policy was issued on December 15, 2009 (the Policy). The Policy, called a "Technology VisionPak," provided commercial general liability coverage.

In May 2010, General Atomics filed a cross-complaint against Banks and TetraVue. The relevant amended cross-complaint, which was filed in November 2010, alleges causes of action against Banks for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, breach of the duty of loyalty and violations of Labor Code provisions, and unlawful business practices. In addition, the cross-complaint alleges causes of action for misappropriation of trade secrets and unfair business practices against both Banks and TetraVue.

Banks and TetraVue tendered the defense of General Atomics's cross-complaint to St. Paul on January 6, 2011. St. Paul sent a denial letter on January 25. In its denial letter, St. Paul asserted a number of grounds for declining to provide a defense, including that the cross-complaint "does not allege any facts that establish the existence of any of the enumerated 'personal injury' or 'advertising injury' offenses."

Banks and TetraVue responded with a letter in which they outlined their understanding of the basis for coverage in the Policy. St. Paul continued to decline to

4

provide a defense.  Banks and TetraVue then filed this action in the San Diego County Superior Court, seeking a declaration that St. Paul had a duty to provide a defense against General Atomics's cross-complaint in the underlying action.

The parties filed simultaneous motions for summary judgment in June 2011.  The trial court issued a tentative order denying Banks and TetraVue's motion for summary judgment and granting St. Paul's motion for summary judgment.  The court determined that St. Paul did not owe Banks or TetraVue a duty to defend against General Atomics's cross-complaint, reasoning in part that, "while plaintiffs may be seeking customers or increasing sales with property taken from [General Atomics], the property taken from [General Atomics] was not advertising material because the allegations are that the property was trade secret or confidential information," and "[a]s such, it is not used by [General Atomics] to attract attention in seeking customers or increasing sales so the Advertising Injury coverage does not apply."

On the same date on which the trial court issued its tentative rulings, the parties appeared before the court for a hearing on the motions.  At the conclusion of the hearing, the court affirmed its tentative order.

The trial court entered judgment in favor of St. Paul and against Banks and TetraVue.  Banks and TetraVue filed a timely notice of appeal.[1]

---

1    Banks and TetraVue filed a request that this court take judicial notice of the jury verdict form and a related court order entitled, "Statement of Decision and Order on Inconsistent Damages," both of which were filed in the underlying action between General Atomics and Banks/TetraVue.  St. Paul opposed the request, arguing that the merits of General Atomics's claims against Banks and TetraVue are irrelevant to the

DISCUSSION

A.      *Legal standards*

1.      *Summary judgment and review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant who moves for summary judgment or summary adjudication bears the initial burden to show that the action or cause of action has no merit—that is, "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (*Id*., subd. (p)(2).) When the burden of proof at trial will be on the plaintiff by a preponderance of the evidence, the moving defendant "must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that

---

question whether the duty to defend exists in this case, and also arguing that the "only facts that matter are the facts known at the inception of the suit." We conclude that the documents for which Banks and TetraVue seek judicial notice are unnecessary to our determination of this appeal, and we therefore decline to take judicial notice of the documents.

the plaintiff 'does not possess and cannot reasonably obtain, needed evidence' " to support an element of the cause of action.  (*Kahn v. East Side Union High School Dist*. (2003) 31 Cal.4th 990, 1003, quoting *Aguilar*, *supra*, 25 Cal.4th at p. 854.)

2.　　*Insurance policy interpretation and the duty to defend*

The central issue in this case is whether the Policy potentially covered any of the claims that General Atomics raised in its cross-complaint, thereby giving rise to St. Paul's duty to defend TetraVue and Banks in the underlying action.  Because this question requires interpretation of the policy provisions, we determine it independently.  (See *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390.)

"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.  [Citation.]  The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.  (Civ. Code, § 1636.)  If contractual language is clear and explicit, it governs.  (Civ. Code, § 1638.)  On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.'  [Citations.]  This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.'  [Citation.]  Only if this rule does not resolve the ambiguity do we then resolve it against the insurer."  (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.)

Whether an insurer has a duty to defend "depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy. [¶] . . . [¶] If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, *suggest a claim potentially covered by the policy*, the insurer's duty to defend arises and is not extinguished until the insurer *negates all facts suggesting potential coverage*. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654–655 (*Scottsdale*), italics added.)

"An insurer . . . 'cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. The pleadings are malleable, changeable and amendable. . . . [C]ourts do not examine only the pleaded word but the potential liability created by the suit.' [Citation.] . . . [T]he third party plaintiff cannot be the arbiter of coverage.' [Citation.]" (*Eigner v. Worthington* (1997) 57 Cal.App.4th 188, 195 (*Eigner*).)

It is well established that "[t]he insurer's duty to defend is *broader* than its duty to indemnify." (*Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541, 547, italics added.) "The . . . duty [to indemnify] runs only to claims that are actually covered by the policy, while the duty to defend extends to claims that are merely potentially covered. [Citations.]" (*Ibid.*) In addition, a court must look "not to whether noncovered acts predominate in the third party's action, but rather to whether there is any potential for liability under the policy." (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1084.) "Any doubt as to whether the facts establish the existence of the defense duty

8

must be resolved in the insured's favor.  [Citations.]"  (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299-300 (*Montrose I*).)

" ' "A duty to defend arises upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. [Citations.]  If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered.  [Citation.]" ' [Citation.]"  (*Sprinkles v. Associated Indemnity Corp*. (2010) 188 Cal.App.4th 69, 77; see also *Crawford v. Weather Shield Mfg., Inc., supra,* 44 Cal.4th at p. 547 [" 'The [insurer's] defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is no potential for coverage . . . .'  [Citation.]"].)

The broad duty to defend shapes each party's burden of proof in seeking summary judgment in a declaratory relief action regarding the duty to defend, such as the declaratory relief action at issue here.  "[T]he insured must prove the existence of a *potential for coverage*, while the insurer must establish the *absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.  Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales.  Any seeming disparity in the respective burdens merely reflects the substantive law."  (*Montrose I*, *supra*, 6 Cal.4th at p. 300.)  A

9

court may conclude that no duty to defend exists only where the underlying complaint " '*can by no conceivable theory raise a single issue which would bring it within the policy coverage*.' " (*Ibid*., quoting *Gray v. Zurich Insurance Co*. (1966) 65 Cal. 2d 263, 276, fn. 15.)

B.    *Analysis*

1.    *The relevant Policy provisions*

The Policy, identified as "Technology VisionPak Commercial General Liability Protection," states generally that it "provides general liability protection for your business."  In addition to coverage for bodily injury and property damage liability, as well as for personal injury liability, the Policy provides coverage for "[a]dvertising injury liability."  With respect to this coverage, the Policy tells insureds:

> "We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:
>
> "• results from the advertising of your products, your work, or your completed work; and
>
> "• is caused by an advertising injury offense committed while this agreement is in effect."

The Policy defines "[a]dvertising injury" as "injury, other than bodily injury or personal injury, that's caused by an advertising injury offense."

An "[a]dvertising injury offense," in turn, is defined as any of the following:

> "• Libel of an individual, other than an individual as a sole owner of a business, in or with covered material.

10

"• Slander of an individual, other than an individual as a sole owner of a business, in or with covered material.

"• *Unauthorized use of any advertising material, or any slogan or title, of others in your advertising*." (Italics added.)

An endorsement that is attached to the policy replaces the above definition of "advertising injury offense" with the following:

"Advertising injury offense means any of the following offenses:

"• Libel, or slander, in or with covered material.

"•  Making known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others.

"• Making known to any person or organization covered material that violates a person's right of privacy.

"• *Unauthorized use of any advertising material, or any slogan or title, of others in your advertising*."[2]  (Italics added.)

The Policy broadly defines "[a]dvertising" as "attracting the attention of others by any means for the purpose of" either "seeking customers or supporters" or "increasing sales or business," and defines "[a]dvertising material" as "any covered material that:  [¶]

---

[2]     This endorsement evidences a copyright date of 2006.  It would appear that the definition of "advertising injury offense" provided in this endorsement was applicable at the time the underlying events are alleged to have taken place.  However, Banks and TetraVue appear to refer to the definition of "advertising injury" in the text of the Policy, as opposed to the endorsement definition.  For purposes of the questions raised in this appeal, the difference in the language of the Policy and the related endorsement is irrelevant.  The relevant portion of the definition of "advertising injury offense"—i.e., "Unauthorized use of any advertising material, or any slogan or title, of others in your advertising"—is the same in both the text of the Policy and the endorsement.

11

[] is subject to copyright law; and [¶] [] others use and intend to attract attention in their advertising."

The Policy generally excludes coverage for intellectual property claims. However, consistent with its coverage for advertising injury liability, the Policy contains the following exception to the intellectual property exclusion:

> "Nor will we apply this exclusion to advertising injury that results from the unauthorized use of any:
>
> "• Copyrighted advertising material;
>
> "• Trademarked slogan; or
>
> "• Trademarked title;
>
> "of others in your advertising."

Under the policy, in order for a defense obligation to exist pertaining to advertising injury liability, three factors must be present: (1) an allegation by General Atomics that TetraVue took material that General Atomics *itself* used and intended to attract the attention of others by any means for the purpose of seeking customers or supporters or for increasing its sales or business; (2) the material in question is subject to copyright law; and (3) an accusation by General Atomics that TetraVue used or was using that material to attract the attention of others for the purpose of seeking customers or supporters, or for the purposes of increasing sales or business.

> 2. *General Atomics's allegations in the operative cross-complaint that are relevant to potential coverage*

General Atomics asserted in its cross-complaint that it brought the action to "remedy the misappropriation of its trade secrets . . . which [Banks] is now using in order

12

to improperly exploit the technology, business plans and strategy and other trade secret information he misappropriated from [General Atomics]."  General Atomics further asserted that it was seeking "to redress other wrongful conduct by Banks and TetraVue not involving [General Atomics's] trade secrets . . . with respect to their misuse of [General Atomics's] confidential non-trade secret information or physical property."  The cross-complaint further alleged that Banks and TetraVue are using this confidential and trade secret information, that they "are exploiting" this confidential and trade secret information, including "printed materials," "for their own profit in connection with TetraVue's business pursuits and capital raising activities" and "to unlawfully and unfairly compete with [General Atomics]."

General Atomics alleged that the unit in which Banks worked at General Atomics had worked "on several technologies that were intended to develop general commercial/industrial promise—i.e., for customers other than the United States government."

Among the information and documents that General Atomics alleged Banks improperly took when he left the company were a "proprietary draft white paper" (the White Paper) in which Banks, who authored the White Paper, explained how the company could "leverage" its 3D imaging technology for shorter-range commercial and/or industrial applications.  General Atomics also alleged that Banks improperly took another document that he had authored, titled " 'Proof of Principle (POP) plan for Advanced 3D diagnostics for industrial applications' " (the POP).  According to General Atomics's cross-complaint, the "objective of this document was to demonstrate the utility

of [General Atomics's] [specialized] technology for 3D high-resolution imaging for commercial industrial inspection." General Atomics alleged that Banks had written, in the POP, that " '*General Atomics (GA) has developed a new technology*,' " and elsewhere in that document stated "that GA ' *has developed an exciting new technology* using laser illumination . . . .' "

General Atomics further alleged that Banks improperly took another document, titled " 'Short Range 3D video and imaging,' " to which General Atomics referred in its cross-complaint as "the 'Short Range Presentation.' " General Atomics asserted that this document contained trade secrets and confidential information, including "extensive market information and revenue and sales projections."

In addition to alleging that Banks had taken materials that involved trade secrets or confidential information, the complaint alleged that Banks had taken "non-confidential . . . presentation materials from conferences which he had attended on [General Atomics's] behalf . . . (which are copyrighted and thus could not be lawfully reproduced) . . . ."

General Atomics specifically alleged that Banks and TetraVue had "improperly used and disclosed [General Atomics's] Trade Secrets in their submission to the [National Science Foundation] regarding 'TetraVue's' proprietary plan for commercial/industrial applications because, as Banks stated during the negotiations to license GA's technology, 'it would be good to use in the new entity [TetraVue] without reinventing it.' " According to General Atomics, "the language and description from [TetraVue's] SBIR [Small Business Innovation Research] grant application *mirror the White Paper* that

14

Banks misappropriated from [General Atomics]." (Italics added.) The cross-complaint also specifically alleged that TetraVue had " 'sent [the] white paper' to at least one prospective customer." Elsewhere, General Atomics alleges that Banks and TetraVue "have begun *directly soliciting current and/or potential customers of* [*General Atomics*]." (Italics added.)

General Atomics asserted that the "[o]nly . . . conclusion [that] can be drawn from [the allegations concerning Banks's purported misdeeds is that] Banks and TetraVue have misappropriated—and continue to misappropriate—[General Atomics] Trade Secrets for their own commercial purposes, and have used and continue to use [General Atomics] Confidential Information other than [General Atomics] Trade Secrets to unlawfully and unfairly compete with [General Atomics] . . . ."

General Atomics acknowledged that it was engaged in marketing the specialized laser technology to customers, and alleged that during a meeting with representatives of a division the United States Army, a General Atomics employee had discussed whether that division of the Army might be "interested in acquiring any of [General Atomics's] new technology," including the laser technology. The Army representatives "revealed" that they had been approached by a " 'little company' " that was using similar technology. Although the Army representatives did not inform General Atomics of the name of the " ' little company,' " General Atomics believed that company to be TetraVue. General Atomics expressly asserted that TetraVue had "solicited the same customer to whom [General Atomics] *was marketing its technology*." (Italics added.)

15

### 3. *Application*

St. Paul argues that it was entitled to summary judgment because "[t]here is simply no reference in [General Atomics's] cross-complaint to the unauthorized use of any materials that [General Atomics] used to attract the attention of others," and further contends that "nothing in the cross-complaint supports a reasonable inference that [General Atomics] was suing for unauthorized use of materials that it used to attract the attention of others."[3] We disagree with St. Paul's reading of the operative cross-complaint. There are a number of allegations in the operative pleading document from which one could reasonably infer that General Atomics was suing Banks and TetraVue, at least in part, for their unauthorized use of materials that General Atomics, itself, had used to "attract the attention of others" in order to seek customers or supporters, or to increase its sales or business. Further, the operative cross-complaint clearly does not negate this possibility. In fact, the cross-complaint suggests potential coverage.

---

[3] It seems clear from St. Paul's briefing on appeal that it essentially concedes that two of the three required conditions for advertising injury liability coverage under the Policy were apparent from General Atomics's cross-complaint—i.e., that the materials that General Atomics has accused TetraVue of taking (1) had been used by TetraVue in order to attract the attention of others for the purpose of seeking customers or supporters, or for the purposes of increasing sales or business, and (2) that these materials were subject to copyright law. St. Paul focuses its briefing solely on the purported lack of allegations in the cross-complaint to support the possibility that General Atomics, itself, had used the materials or documents as "advertising"—i.e., to attract the attention of others to seek customers or supporters or to increase sales or business. We would agree with this assessment, and therefore focus our attention on the element that the parties focus on—i.e., whether the cross-complaint can be fairly read to allege a claim for injury resulting from TetraVue's and Banks's "unauthorized use of [*General Atomics's*] advertising material."

16

St. Paul cites General Atomics's assertion in the cross-complaint that much of the allegedly misappropriated materials contained trade secret and confidential materials as supporting St. Paul's contention that the cross-complaint does not contain any allegation that General Atomics used any of the materials in question to attract the attention of others. St. Paul essentially maintains that because General Atomics alleges that the materials that Banks misappropriated and improperly used involved trade secrets and/or confidential information, those materials could not have been "advertising" materials. According to St. Paul, given the nature of the material as involving trade secret and/or confidential information, and given the absence of specific allegations that General Atomics had provided these materials to "anybody outside of [General Atomics]," one cannot "reasonably" interpret the cross-complaint "as alleging a claim based on [General Atomics's] advertising materials."

It is far too simplistic to conclude that because the materials in question may have included trade secret and/or confidential information, they could not constitute "advertising" or "advertising materials" within the meaning of the Policy definitions unless General Atomics expressly identified the materials as such in its cross-complaint. The Policy's definition of "advertising" is extremely broad, and there is no requirement in the Policy that in order to constitute "advertising material," General Atomics must have distributed the materials to the public or even made the materials widely available to people outside of General Atomics. Rather, the Policy requires merely that General Atomics have used the materials to "attract[] the attention of others by any means for the purpose of" either "seeking customers or supporters," or "increasing sales or business."

17

The cross-complaint need not have contained specific allegations that General Atomics used the material to attract the attention of others in order to seek customers or supporters or to increase sales or business in order for it to be deemed to have triggered a duty to defend based on the possibility of coverage. The law provides that if the facts "stated *or fairly inferable in the complaint*, or otherwise known or discovered by the insurer, *suggest* a claim potentially covered by the policy" (*Scottsdale, supra,* 36 Cal.4th at p. 655, italics added), the insurer's duty to defend is triggered. The facts fairly inferable from the cross-complaint clearly suggest a claim that is potentially covered by the Policy. Specifically, many of the allegations are sufficient to create the reasonable inference that General Atomics used some of the materials that it was alleging Banks and TetraVue misappropriated in its own efforts to attract the attention of others to gain their support and/or increase its business.

For example, at a minimum, it is reasonable to infer that the "non-confidential . . . presentation materials from conferences which [Banks] had attended," that General Atomics alleged Banks had improperly taken, were "advertising" materials under the Policy definition. General Atomics specifically alleged that while employed at General Atomics, Banks had used these materials in presentations at conferences. A reasonable implication is that these materials were presented to individuals outside of General Atomics who attended these conferences. A further reasonable inference is that in having Banks give these presentations, General Atomics was intending to "attract the attention of others" in order to seek customers or supporters, or to increase its sales or business. A claim that after leaving General Atomics and starting TetraVue, Banks used

18

these materials to try to market the technology to potential customers is, at a minimum, a claim that is potentially covered by the Policy.

St. Paul seizes on one particular allegation in the cross-complaint to assert that the documents that General Atomics accused Banks of misappropriating were intended for internal General Atomics use only, and could not have constituted "advertising" materials. Specifically, St. Paul cites to the allegation that, in describing TetraVue's business, as set forth in the summary of the grant that Banks received from the National Science Foundation, Banks copied "nearly verbatim from non-public internal [General Atomics] documents . . . created to educate [General Atomics] management about potential commercial applications for [General Atomics's] 3D imaging technology . . . ." However, the mere allegation that *some* documents on which Banks relied in creating his grant application were "non-public internal documents" does not eliminate the possibility that other documents that Banks was accused of taking from General Atomics and using to promote TetraVue to potential customers were not "internal" General Atomics documents. The cross-complaint does not expressly identify the documents to which it is referring in this paragraph. Although St. Paul *assumes* that the cross-complaint is referring to all three of the specific documents that General Atomics identified as being misappropriated by Banks—i.e., the White Paper, the POP and the Short Range Presentation—in claiming that the documents were nonpublic, there is no basis for such an assumption. The cross-complaint's reference to some materials being used solely for internal purposes does not conclusively establish that General Atomics did not use any of the other identified materials to attract the attention of others for the purpose of gaining

19

supporters and/or increasing its business.  Further, other allegations of the cross-complaint reasonably imply that at least some of the documents that Banks is accused of misappropriating were *not* intended solely for internal dissemination.  In particular, the wording of these documents, as quoted in the cross-complaint, implies that the documents may very well have been used to attract attention *from others* for the purpose of gaining their support or business.

For example, the POP states that " '*General Atomics (GA) has developed a new technology* that captures all three coordinates . . . .  This enables GA to provide a low cost solution with high resolution images . . . .' "  The italics are in the original and highlight the manner in which this document was written.  The document informs the audience that "General Atomics" will be referred to as "GA" throughout the remainder of the document.  This would be an odd statement to include if this document was written solely for internal use at General Atomics, whose employees would presumably know that "GA" is an acronym for General Atomics.  In addition, the fact that the sentence appears to highlight for the reader that General Atomics has developed "new technology" suggests that the writing was intended for an external, rather than an internal, audience. One could clearly infer that this language was intended to attract the attention of others for the purpose of gaining their support, or to sell the " 'new technology' " to a potential customer.  The same document is also alleged to state "that GA '*has developed an exciting new technology* using laser illumination . . . .' "  The language used and highlighted—i.e. " '*exciting new technology*' "—appears to be typical advertising content, intended to attract the attention of those outside of General Atomics.

Further, the cross-complaint alleges that the Short Range Presentation concludes with the following statement: " '[T]o be most effective [3D] instruments typically need to possess high capture speeds to eliminate any motion-induced blurring, high resolution in all three spatial dimensions, [and] high throughput . . . . It has been difficult to meet all of these requirements simultaneously, *but with GA's TDLI technology*, that can now be changed.' " (Italics added.) By referring to the technology as "GA's" technology, rather than "our" technology, this document reads more like material meant for an outside audience than for an internal one.

St. Paul cannot rely on the absence of express allegations in the cross-complaint that General Atomics used the relevant materials to "attract the attention of others" to justify its conclusion that there was no potential for coverage. First, one would not expect that in a complaint alleging misappropriation of trade secrets by Banks and TetraVue, General Atomics would discuss how *it*, General Atomics, may have used the materials in question. Specifically, it is not surprising that the cross-complaint would not directly allege that General Atomics used the materials to attract the attention of others to seek customers and/or increase its business. The cross-complaint is directed at Banks's and TetraVue's conduct, and thus focuses on how *they* used the materials, *not* on how *General Atomics* used the materials. Further, as noted, " 'pleadings are malleable, changeable and amendable,' " and for this reason " '[c]ourts do not examine only the pleaded word *but the potential liability created by the suit*.' [Citation.]" (*Eigner*, *supra*, 57 Cal.App.4th at p. 195, italics added.) " '[T]he third party plaintiff cannot be the arbiter of coverage.' [Citation.]" (*Ibid.*) Thus, the absence of express allegations that General

21

Atomics was using or had used at least some of the documents in a manner that would qualify as "advertising" under the broad definition provided in the Policy does not negate the possibility that General Atomics in fact did use those documents in such a manner.

In order for St. Paul's duty to defend Banks and TetraVue against General Atomics's cross-complaint to have been triggered, it is necessary only that the cross-complaint reveal the "potential" or "possibility" of coverage. As we have explained, if the facts "stated *or fairly inferable in the complaint*, or otherwise known or discovered by the insurer, *suggest* a claim potentially covered by the policy" (*Scottsdale, supra,* 36 Cal.4th at p. 655, italics added), the insurer's duty to defend is triggered. "The scope of the duty does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the alleged facts or known extrinsic facts reveal a possibility that the claim may be covered by the policy." (*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1034.) An insurer may decline to defend an insured only where the allegations of the cross-complaint, or extrinsic facts of which the insurer becomes aware, *exclude* the possibility that the underlying complaint alleges a covered claim. Thus, in this case, St. Paul could decline to provide a defense to Banks and TetraVue only if it could conclusively eliminate the possibility that General Atomics was alleging that it suffered harm from the misappropriation and use of its advertising material. As the allegations of the cross-complaint adequately demonstrate, the cross-complaint does not *exclude* this possibility. Rather, the facts alleged reveal *at least a*

22

*possibility* that a claim asserted by General Atomics against Tetravue and Banks *may* have been covered by the Policy, thereby triggering St. Paul's duty to defend.[4]

TetraVue and Banks have established that the potential for coverage under the Policy existed based on the allegations of the cross-complaint, and St. Paul has not pointed to any allegations in the cross-complaint that establish the *absence of a potential for coverage*. (See *Montrose I*, *supra*, 6 Cal.4th at p. 300.) TetraVue and Banks are therefore entitled to have summary judgment entered in their favor in the declaratory relief action regarding St. Paul's duty to defend.

IV.

DISPOSITION

The judgment is reversed and the cause is remanded with directions to enter judgment in favor of TetraVue and Banks. TetraVue and Banks are awarded their costs on appeal.

AARON, J.

WE CONCUR:

McDONALD, Acting P. J.

IRION, J.

---

[4]     Because we conclude that the cross-complaint sufficiently "alleges liability for damages that are potentially covered under the policy," we need not consider the extrinsic evidence that TetraVue and Banks presented.

23