Filed 10/25/13 (10/9/13 modification & unmodified opn. attached)

***CERTIFIED FOR PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF BELL, | B247362 |
| Petitioner, | (Los Angeles County Super. Ct. No. BC445497) |
| v. | |
| SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES, | ORDER |
| | (1) MODIFYING OPINION |
| | (2) DENYING PETITION FOR REHEARING |
| Respondent; | |
| ROBERT A. RIZZO, | [NO CHANGE IN JUDGMENT] |
| Real Party in Interest. | |

BY THE COURT:

It is ordered that the opinion filed herein on October 4, 2013, and modified on October 9, 2013, is further modified as follows:

(1) On page 3, under the second full paragraph under the heading "2", *The Underlying Actions,* line 4, the sentence ending, "still in office, a fact which prevented the City from taking action in its own name." Please add a footnote at the end of sentence which reads:

1

Rizzo challenges this fact, relying on press releases and newspaper articles which purportedly show the City had begun to retake control of itself prior to the filing of the AG's action. None of these documents are properly before this court.

(2) On page 20, in the first full paragraph, line 4, the clause ending "both the City's action and the AG's action were brought on behalf of the City, . . . ." Please add a footnote after the comma, which reads:

Rizzo argues that the AG's action was not brought entirely on behalf of the City, and that some of the claims in the AG's action were brought on behalf of the State itself, rendering them third-party claims. At oral argument, however, Rizzo conceded that the AG's action was brought solely on behalf of the City. When asked to identify the third-party claims at issue in this action, Rizzo identified only the criminal actions. He conceded that the claims at issue in the AG's action were brought "standing in the shoes of the City," and specifically argued that "civil claims made by the AG" were to be defended by the City as "first-party claims."

(3) All footnotes are to be renumbered accordingly.

(4) In our modification order of October 9, 2013, we modified the opinion to add a footnote on page 31. The first line of that footnote includes the reference "(see fn. 6, *ante*)." That reference should be modified to read: "(see fn. 7, *ante*).

The Petition for Rehearing filed herein on October 18, 2013 on behalf of Real Party in Interest, Robert A. Rizzo, is denied.

Filed 10/9/13 (unmodified opn. attached)
*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF BELL,<br><br>     Petitioner,<br><br>     v.<br><br>SUPERIOR COURT OF THE<br>STATE OF CALIFORNIA, COUNTY OF<br>LOS ANGELES,<br><br>     Respondent;<br><br>ROBERT A. RIZZO,<br><br>     Real Party in Interest. | B247362<br><br>(Los Angeles County<br>Super. Ct. No. BC445497)<br><br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on October 4, 2013, is modified as follows:

(1)     On page 5, line 2, sentence beginning "a public record (Gov. Code . . . ) . . .  misappropriation of public funds."  Please add a footnote at end of sentence which reads:

This court takes judicial notice (Evid. Code, § 452, subds. (d) & (g)) that, on October 3, 2013, Rizzo entered a plea of nolo contendere to each count alleged in the three criminal proceedings.  It appears that, at some point prior to Rizzo's plea, the second criminal complaint was amended to charge one count of conflict of interest and six counts of perjury (Pen. Code, § 118, subd. (a)).  Rizzo pleaded nolo contendere to, and was convicted of, a total of 69 counts.

(2)     On page 18, under the first full paragraph under the heading "e", *The Instant . . .* , line 2, delete the words "duty to defend is, in any way, broader than the duty to indemnify.  Clearly, it is not." and replace with the following:

duty to defend is dependent upon the scope of the duty to indemnify.

(3)     On page 18, under the first full paragraph under the heading "e", *The Instant …* , line 11, delete the entire line beginning "tender, allege facts which would fall within the scope of the indemnity." and replace with the following:

tender, allege facts which would, at least potentially, fall within the scope of the duty to indemnify.

(4)     On page 31, under the heading "3.  Public Policy Supports our Conclusion," line 4, following the sentence ending "a period of 17 years," please add a footnote which reads:

As we have previously noted (see fn. 6, *ante*), the criminal charges against Rizzo have been resolved by his plea of nolo contendere on October 3, 2013.

Filed 10/4/13 (unmodified version)

***CERTIFIED FOR PUBLICATION***


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| CITY OF BELL,<br><br>    Petitioner,<br><br>    v.<br><br>SUPERIOR COURT OF THE<br>STATE OF CALIFORNIA, COUNTY OF<br>LOS ANGELES,<br><br>    Respondent;<br><br>ROBERT A. RIZZO,<br><br>    Real Party in Interest. | B247362<br><br>(Los Angeles County<br>Super. Ct. No. BC445497) |


ORIGINAL PROCEEDINGS in mandate. Ralph W. Dau, Judge. Petition granted with directions.

Aleshire & Wynder, David J. Aleshire, Anthony R. Taylor and Michael C. Huston, for Petitioner, City of Bell.

No appearance for Respondent.

Spertus, Landes & Umhofer and James W. Spertus for Real Party in Interest, Robert A. Rizzo.

_____

1

Robert Rizzo, the former Chief Administrative Officer of the City of Bell (City), has been sued by the City, as well as the Attorney General acting on behalf of the City, for restitution for his alleged looting of the City's coffers.  He has also been criminally charged with multiple counts of misappropriation of public funds.  Rizzo, by complaint for declaratory relief, seeks a judgment that the City is contractually obligated to provide him with a defense to these civil and criminal actions.  We conclude that, as a matter of law, the City does not owe Rizzo such a defense.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

1.    *Underlying Factual Allegations*

The City is a charter city with a population of 38,250.  It was discovered that Rizzo, as well as the assistant chief administrative officer and five City council members, were receiving salaries well in excess of the amounts paid to similar individuals in similarly sized cities, and that these seven individuals went to great lengths to conceal their salaries from public knowledge.  (*People ex rel. Harris v. Rizzo* (2013) 214 Cal.App.4th 921, 928.)  The receipt and approval of excessive salaries are not, by any means, the only acts of wrongdoing alleged against Rizzo and the other individuals.  A criminal complaint against Rizzo charges multiple counts of misappropriation of public funds (Pen. Code, § 424, subd. (a)) arising out of numerous

---

[1]    As we explain below, this case is before us on a petition by the City for a writ of mandate directing the trial court to vacate its order denying the City a jury trial on the unstayed issues raised in Rizzo's complaint.  In light of our discussion and conclusions regarding the substantive merit of Rizzo's claim for a defense, however, we will have no need to reach or decide the jury trial issue.

2

unauthorized "loans" Rizzo made of City funds to various City officers and employees,[2] and other entities. A full accounting of Rizzo's alleged misdeeds is unnecessary to the resolution of this appeal. It suffices to say that, as the City alleged, "[t]his lawsuit arises out of a series of long running dishonest acts by . . . Rizzo . . . and other City administrators running nearly 17 years. During this time, . . . Rizzo embezzled, stole, and misappropriated millions of dollars in City funds by obtaining grossly excessive and completely unwarranted compensation packages."

2.    *The Underlying Actions*

There are five actions for which Rizzo seeks the City to pay his defense costs. We briefly discuss each action.

The initial complaint against Rizzo was brought by the Attorney General, on behalf of the City. We call this "the AG's action." At the time the AG's action was filed, Rizzo and the City council members with whom he was allegedly in league were still in office, a fact which prevented the City from taking action in its own name. The complaint, filed on September 15, 2010, alleged causes of action for waste of public funds, negligence, fraud, conflict of interest, and breach of fiduciary duty. The current status of the AG's action is not indicated in the record in the instant writ proceeding.[3]

---

[2]    One such count alleges Rizzo made an unauthorized $80,000 loan to himself.

[3]    A demurrer to the Attorney General's first amended complaint was sustained without leave to amend; the Attorney General successfully appealed. (*People ex rel. Harris v. Rizzo, supra,* 214 Cal.App.4th at p. 929.) We concluded that the Attorney General should have been granted leave to amend, in order to: (1) pursue the action on behalf of the City; (2) modify the allegations of several of the causes of action already alleged; and (3) allege several other causes of action the Attorney General argued that it

3

As we shall discuss, Rizzo tendered the AG's action to the City for a defense. The City refused, which resulted in Rizzo filing a cross-complaint against the City, seeking a declaration that the City must defend and indemnify him against the Attorney General's action. This cross-complaint, in turn, prompted the City, on November 24, 2010, to bring its own cross-complaint against Rizzo. We call this "the City's action." The City alleged causes of action against Rizzo for intentional misrepresentation, constructive fraud, breach of fiduciary duty, negligence, conflict of interest, declaratory relief, and unjust enrichment.

In addition to the two civil actions, Rizzo faces two criminal complaints, and one indictment. The first complaint, filed September 20, 2010, charged 44 counts of misappropriation of public funds[4] (Pen. Code, § 424, subd. (a)), 3 counts of conflict of interest (Gov. Code, § 1090) and 6 counts of falsification of public records (Gov. Code, § 6200, subd. (c)). The second criminal action charges 1 count each of misappropriation of public funds and conflict of interest.[5] The third criminal action was instituted by an indictment filed March 29, 2011. It alleges 1 count of conspiracy to

could allege. (*Id*. at p. 951.) We also stated that, since the City had, in the interim, brought a cross-complaint against Rizzo in its own name, we left it "to the trial court, on remand, to decide whether and how to consolidate the City's action against Rizzo with the Attorney General's action against Rizzo on behalf of the City." (*Id*. at p. 951, fn. 31.)

[4]     The complaint was subsequently amended to add a 45th count of misappropriation of public funds.

[5]     The complaint in the second criminal action does not specifically allege the facts underlying these charges; however, it is alleged that the property involved had a value exceeding $1,300,000.

4

misappropriate public funds, 2 counts of conflict of interest, 4 counts of secretion of a public record (Gov. Code, § 6200), and 1 count of misappropriation of public funds.

### 3. *Rizzo's Tender of the Actions for a Defense is Denied*

Shortly after the AG's action, the City's action, and the criminal complaints were filed, Rizzo tendered them to the City for a defense.[6] Rizzo relied on a term in his employment contract with the City, as well as statutory provisions which govern the defense of public entity employees by their public entity employers.[7]

We first set forth the language of the defense obligation in Rizzo's employment contract. It is part of an indemnification clause,[8] which states as follows: "City shall defend, hold harmless and indemnify Employee against any claim, demand, judgment or action, of any type or kind, arising out of any act or failure to act, by Employee, if such act or failure to act was within the course and scope of Employee's employment. City may compromise and settle any such claim or suit provided City shall bear the entire cost of any such settlement."

---

[6]     The record does not reflect any tender of the second and third criminal actions for a defense.

[7]     In addition, Rizzo relied on Labor Code section 2802. Rizzo's right to a defense under any of the statutory provisions on which he relied is not before us; as we shall discuss, the matter before us in the instant writ proceeding relates only to his contractual defense rights. Nonetheless, we note that this argument appears to be foreclosed, at least with respect to the criminal actions, by *Los Angeles Police Protective League v. City of Los Angeles* (1994) 27 Cal.App.4th 168, 177.)

[8]     Rizzo repeatedly represents that the City drafted the clause. Yet the contract specifically states that the terms of the contract "have been negotiated and discussed between the parties," and that the contract "reflects their mutual agreement." It provides that, because of those negotiations, "it would be inappropriate to deem any party to be the drafter."

Government Code section 995 provides that, subject to statutory exceptions, a public entity is generally required to provide for the defense of a civil action brought against an employee or former employee, on account of an act or omission in the scope of the employee's employment.  Under Government Code section 995.2, a public entity may refuse to provide an employee or former employee with a defense to a civil action if the public entity determines:  (1) that the act or omission was not within the scope of the employee's employment; (2) that the employee acted or failed to act because of actual fraud, corruption, or actual malice; or (3) the defense of the action by the public entity would create a conflict of interest between the public entity and the employee or former employee.  (Gov. Code, § 995.2, subd. (a).)  The City declined to defend Rizzo in the civil actions, relying on all three of these grounds.

Under Government Code section 995.8, a public entity "is not required to provide for the defense of a criminal action or proceeding . . . brought against an employee or former employee," but may do so if:  (1) the criminal action is brought on account of an act within the course and scope of the employee's employment; and (2) the public entity determines that provision of a defense would be in its best interests and the employee or former employee acted, or failed to act, in good faith, without actual malice, and in the apparent interests of the public entity.  Based on the findings the City had made which justified its denial of a defense of the civil actions against Rizzo, the City also denied a defense of the criminal actions against him.

6

4. *Rizzo Seeks Declaratory Relief*

As noted above, Rizzo filed a cross-complaint against the City (in the Attorney General's action) alleging three causes of action for declaratory relief, each seeking provision of a defense and indemnity. The first cause of action relied on Rizzo's employment contract; the second relied on Government Code section 995; the third relied on Labor Code section 2802.

Rizzo's complaint was filed prior to the City's action being filed against Rizzo. It was also filed before the third criminal action, and possibly the second. As such, Rizzo's complaint did not seek a defense for those actions. There is no indication in the record before us that Rizzo ever amended or supplemented his complaint to seek a defense of those actions. However, both parties proceeded as though these actions are encompassed by Rizzo's complaint.

5. *The Proceedings Leading to the City's Writ Petition*

The procedural history leading to the instant writ petition is somewhat convoluted. At one point, the City attempted to take Rizzo's deposition, but Rizzo asserted his Fifth Amendment privilege and refused to answer all questions put to him concerning relevant events. As a result, in January 2012, the City sought a stay of Rizzo's claims against it, pending such time as he could meaningfully participate in discovery. Rizzo did not oppose a stay – except he sought to pursue that part of his cause of action based on his employment contract which sought a declaration that the City must provide him with a defense. Rizzo argued that he was entitled to an

7

immediate defense, at City expense, of the civil and criminal proceedings, regardless of whether he may ultimately be entitled to indemnification.

On April 30, 2012, the court ordered that both Rizzo's action against the City and the City's action against Rizzo be stayed pending further order of the court.[9] However, the court did not stay Rizzo's partial cause of action against the City for a defense, pursuant to his employment contract. In its order, the court analyzed the language of Rizzo's employment contract and controlling law, and concluded that the City was required "to defend Rizzo from the time he tenders the defense of a claim arising out of any act or failure to act," regardless of whether the act or failure to act was within the course and scope of his employment.

The court's order indicated that the parties could "stipulate that the court's construction of . . . Rizzo's contract would be unchanged by a trial . . . . " Otherwise, the court would set a trial date on Rizzo's partial cause of action for a declaration that the City was required by its employment contract to provide him with a defense.[10]

On May 16, 2012, the City demanded a jury trial. On September 5, 2012, Rizzo moved to strike the City's demand for a jury trial. Rizzo argued that the sole issue for trial was interpretation of his employment contract, which presented an issue of law for the court. The City responded that numerous factual issues existed, including issues

---

[9] At this time, the AG's action was stayed pending appeal.

[10] Rizzo argues the City should have appealed from this order and, having failed to do so, is barred from challenging it now. But the order itself simply regarded the scope of the stay, with which the City apparently had no quarrel. The trial court clearly indicated its construction of the contract was preliminary, and that (unless the parties stipulated otherwise) it was subject to change at trial.

relating to whether the contract was ambiguous and issues relating to its affirmative defenses. The trial court, however, agreed with Rizzo and, on January 31, 2013, ordered the City's jury trial demand stricken.

      6.    *The City's Writ Petition and the Issues Raised*

On March 8, 2013, the City filed its petition for writ of mandate, challenging the trial court's order striking its jury trial demand. We issued a temporary stay and sought preliminary opposition. In the City's reply to Rizzo's opposition, the City argued that interpreting Rizzo's employment contract to require the City to provide a defense would render the contract void as against public policy. In other words, the City raised the issue that the employment contract should be interpreted, as a matter of law, not to require the City to provide a defense to the actions. Rizzo immediately filed a motion to strike those portions of the City's reply which were not germane to the narrow issue of whether the City was entitled to a jury trial. We did not rule on the motion at that time; we will now deny it.

On May 8, 2013, we extended the stay order and issued an order to show cause. We asked the parties to brief seven enumerated issues, specifically including: (1) "Does Rizzo's employment contract obligate the [City] to provide indemnity to Rizzo against: [¶] (a) Criminal charges involving allegations in which the City and/or the citizens thereof were victims? [¶] (b) Civil actions alleging that Rizzo engaged in ultra vires acts and/or the waste or misuse of funds belonging to the City and/or the citizens thereof?" and (2) "If there is no obligation to provide indemnity for such claims under the terms of Rizzo's employment contract, on what rationale and authority would the

9

City be obligated to provide a defense to such claims?"  The parties briefed the issues as requested.

As this court continued its review of the applicable law, we sought further briefing on additional issues, including:  (1) whether the indemnity clause in Rizzo's employment contact was "a routine third-party indemnity clause which does not extend to first-party claims in the absence of clear and explicit language to that effect"; (2) whether the clause was "*reasonably* subject to the interpretation that the City intended to pay for the defense of any action brought by the City, or on its behalf, against Rizzo"; and (3) whether "Government Code section 9[9]6.6, which permits a governmental entity to contract to give its employees additional [defense] rights,[11]] permit a governmental entity to agree to provide its employee a defense to *future* criminal conduct, not yet committed."  The parties briefed the issues as requested.[12]

### ISSUES PRESENTED

We first consider the terms of Rizzo's employment agreement, and conclude that the clause on which he relies is simply a third-party indemnification agreement, which

---

[11]     As we shall discuss, we have now concluded that our characterization of Government Code section 996.6 was not entirely correct.

[12]     To some extent, Rizzo chose not to brief the issues.  As the sole issue left unstayed by the trial court related to the City's alleged contractual obligation to *defend* Rizzo, Rizzo believed any issues relating to whether the City had a contractual obligation to *indemnify* him were simply not ripe for review before this court.  As Rizzo argued that the City's contractual defense obligation is wholly unrelated to its contractual indemnity obligation, Rizzo declined to address, in part, this court's questions relating to indemnity.  As we shall discuss, we conclude the contractual provisions relating to defense and indemnity are inextricably intertwined, and the determination of whether a duty to defend exists depends on whether there is a *potential* for indemnity.

10

does not apply to civil actions, by or on behalf of, the City itself. As the indemnity agreement does not apply to such actions, the duty to defend likewise does not apply to them either. We then consider the statutory provisions governing public entity indemnity for criminal prosecutions and conclude that, even if the City had contracted to provide Rizzo a defense to criminal prosecutions, such an agreement would be unenforceable, as the City has no statutory power to make such an agreement. Finally, we address considerations of public policy, and conclude that they fully support our result.

Rizzo argues that we should not reach these issues. He takes the position that if the employment contract is to be interpreted as a matter of law, the trial court was correct in striking the City's request for a jury trial, and we should simply deny the writ petition and let the trial court interpret the contract in the first instance. Such a course of action would, in our view, be a waste of judicial resources. The contract can be interpreted as a matter of law; the parties have been given a full opportunity to brief the issues before this court; and it appears, from the trial court's ruling on the stay motion, that the trial court's present interpretation of the contract is erroneous.

We will conclude that the contract does not require the City to provide Rizzo with a defense to the underlying actions. We will therefore grant the City's writ petition, and direct that the trial court conduct no trial, bench or jury, on Rizzo's partial cause of action for a defense under his employment contract, as the City is entitled to judgment on that claim as a matter of law.

## DISCUSSION

1. *Interpreting the Language of the Agreement Itself*

    a. *Standard of Review*

The interpretation of a written instrument, even though it involves what might properly be called questions of fact, is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Since indemnity agreements are construed under the same rules which govern the interpretation of other contracts, the indemnity agreement must be interpreted so as to give effect to the mutual intention of the parties. (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969; Civ. Code, § 1636.) In interpreting an express indemnity agreement, the courts look first to the words of the contract to determine the intended scope of the indemnity agreement. (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1737.) The intention of the parties is to be ascertained from the "clear and explicit" language of the contract, and if possible, from the writing alone. (Civ. Code, §§ 1638-1639.) Unless given some special meaning by the parties, the words of a contract are to be understood in their "ordinary and popular sense," focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made. (Civ. Code, § 1644; *Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 504; *Lloyd's Underwriters v. Craig & Rush, Inc.* (1994) 26 Cal.App.4th 1194, 1197-1198.)

12

When a dispute regarding the meaning of a contractual provision exists, the court must first determine whether on its face the language is capable of differing or inconsistent reasonable interpretations. (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 848.) The test "is not whether [the instrument] appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 37; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.) Accordingly, if the instrument is reasonably susceptible to the interpretation urged, the court must receive any relevant extrinsic evidence the party puts forth to prove its interpretation. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.) If there is no material conflict in the extrinsic evidence, the trial court must interpret the contract as a matter of law. Otherwise, it is a factual conflict dependent on the credibility of extrinsic evidence to be properly resolved by the jury. (*Ibid.*)

In this case, Rizzo is correct when he argues that there are no factual issues to resolve. The dispute over the interpretation of the employment contract between the City and Rizzo is entirely one of law. Our standard of review is therefore de novo.

b.     *Non-Insurance Indemnity Contracts*

In *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541, 552 (*Crawford*), the California Supreme Court articulated the appropriate standard of review for the interpretation of noninsurance indemnity agreements: "subject to public policy and

13

established rules of contract interpretation, the parties have great freedom to allocate such responsibilities as they see fit. . . . [¶] Though indemnity agreements resemble liability insurance policies, rules for interpreting the two classes of contracts do differ significantly." (*Id.* at pp. 551-552.) Ambiguities in a policy of insurance are construed against the insurer because the insurer has received premiums to provide the agreed protection. (*Ibid.*) In a noninsurance indemnity agreement, however, it is the indemnitee who may often have the superior bargaining power, and this gives rise to public policy concerns which influence how such agreements are construed. (*Ibid.*)

c. *Duty to Defend in Indemnity Agreements*

We now turn to the issue of the scope of the duty to defend in indemnity agreements, and, specifically, its relation to the scope of the duty to indemnify. In the absence of a contrary intention in the language used, the law will imply, in an agreement to indemnify, an agreement to defend actions brought against the indemnitee "in respect to the matters embraced by the indemnity." (Civ. Code, § 2778, subd. 4.) In other words, in the absence of any contrary intention, the scope of the duty to defend which is implied in an indemnification clause has the same scope as the duty to indemnify. Conversely, if an action is brought against the indemnitee which is *not* "embraced by the indemnity" duty, there is no duty to defend.

However, sometimes it will not be clear whether an action brought against the indemnitee is within the scope of the indemnity until after the underlying action has been resolved. In those situations, the duty to defend nonetheless arises. That is to say, the law implies in every indemnity contract, unless the contract provides to the contrary,

14

the duty to defend claims which, at the time of tender, *allege* facts that would give rise to a claim of indemnity. (*Crawford, supra,* 44 Cal.4th at p. 558.)

This rule of law presumes that there is no language to the contrary. The parties are free to agree to a broader duty to defend; that is, the parties can agree that a defense will be provided even in situations where the facts alleged would not give rise to a claim of indemnity.[13] The parties may also agree to a more narrow duty to defend, and specifically agree that, for example, no defense will be provided, but defense costs will be reimbursed only if the underlying claim was ultimately encompassed by the indemnity. (*Crawford, supra,* 44 Cal.4th at pp. 556-557.) What matters is simply whether the parties agreed to a different duty to defend than the one implied in all indemnity contracts by Civil Code section 2778, subdivision 4; and, if not, whether the underlying claims, at the time of tender, alleged facts that would give rise to a claim of indemnity.

---

[13] Rizzo relies on case authority discussing the somewhat related issue of whether a duty to defend exists when an insurer agreed to defend a claim which, by statute or public policy, an insurer is prohibited from insuring. (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1417 [there is no public policy against insurers contracting to provide a defense to insureds facing criminal charges]; *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 487 [insurer agreed to indemnify for, and defend claims alleging, malicious prosecution; coverage is barred by Insurance Code section 533, but not defense]; (*B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 101 [an insurer and an insured are free to contract for the provision of a defense to a claim which cannot be indemnified, although they did not do so in this case].) We have no quarrel with this authority; it is simply not material. The issue with which we are presently concerned is not whether the City *could have* agreed to defend Rizzo for actions brought by City itself, but whether *it did*.

### d. *Indemnity Agreements are Generally Not Exculpatory*

As we noted above, in a noninsurance indemnity agreement, in contrast to an insurance agreement, the indemnitee may often have the superior bargaining power, and, as a result, public policy concerns influence how such agreements are construed. As such, if a party seeks, in a noninsurance agreement, to be indemnified for protections beyond those afforded by the doctrines of implied or equitable indemnity—for his or her own active negligence, or regardless of the indemnitor's fault—the language on the point must be particularly clear and explicit, and will be construed strictly against the indemnitee. (*Crawford, supra,* 44 Cal.4th at p. 552.)

This rule applies when the indemnitee seeks to be indemnified for claims made by the other party to the contract – the indemnitor – itself. "[A] clause which contains the words 'indemnify' and 'hold harmless' is an indemnity clause which generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons. [Citation.] Indemnification agreements ordinarily relate to third party claims." (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969.) "An indemnity agreement may provide for indemnification against an indemnitee's own negligence, but such an agreement must be clear and explicit and is strictly construed against the indemnitee." (*Rooz v. Kimmel* (1997) 55 Cal.App.4th 573, 583.)

Cases which have interpreted an indemnification agreement to act as an exculpatory clause between the parties to the agreement have involved agreements which contain language clearly providing that the indemnification clause applied to

16

such claims. (E.g., *Rooz v. Kimmel, supra,* 55 Cal.App.4th at p. 586 [indemnification clause provided that indemnitee had been requested to act as an accommodation and without consideration; indemnitor agreed to protect indemnitee against " 'all liabilities . . . which may be sustained or incurred by [indemnitee] under, or arising directly or indirectly out of' " the acts it had been requested to perform].) Putting it another way, as one court explained, "If the parties go out of their way and say 'we really, really mean it,' language clearly contemplating exculpation may be enforced." (*Queen Villas Homeowners Assn. v. TCB Property Management* (2007) 149 Cal.App.4th 1, 6 (*Queen Villas*).)

In *Queen Villas*, a management company attempted to rely on an indemnity clause in its agreement with a homeowners association to defeat an action by the association alleging the management company had breached the agreement.[14] The indemnification clause simply provided that the association would indemnify the management company " 'against any and all claims, costs, suits, and damages . . . arising out of the performance of this agreement or in connection with the management and operation of the [a]ssociation . . . . ' " (*Id.* at p. 4.) The court noted that the management company "seeks to conscript the indemnification agreement in this case into a direct, two-party exculpatory clause," (*id.* at p. 5) and rejected the attempt. The court found no language in the terms of the contract indicating an intent for the indemnification clause to go "beyond the usual context of third party indemnification."

---

[14] Rizzo argues that *Queen Villas* should not be relied upon in this case because it involved only a claim for "indemnity," not defense. We disagree. In the context of this case, that is a distinction without a difference.

17

(*Id*. at p. 7.)  The court further noted "the reductio ad absurdum of the . . . management company's position vis-à-vis the association's contract claims . . . .  Under the . . . management company's interpretation, it could just outright plain fail to do any work at all for the association, such as hiring a gardening company or arranging for insurance or the typical things that property managers do, and the clause would protect it even from a breach of contract action by the association for having paid for services never performed."  (*Id*. at p. 8.)

### e.     *The Instant Indemnification Agreement*

We now turn to the terms of the instant agreement, and first consider whether the duty to defend is, in any way, broader than the duty to indemnify.  Clearly, it is not. The duty to defend and duty to indemnify are not only discussed in precisely the same terms, they are part of the same sentence.  We repeat the language:  "City shall defend, hold harmless and indemnify Employee against any claim, demand, judgment or action, of any type or kind, arising out of any act or failure to act, by Employee, if such act or failure to act was within the course and scope of Employee's employment.  City may compromise and settle any such claim or suit provided City shall bear the entire cost of any such settlement."  There is no defense obligation beyond the indemnity obligation; thus, there is no duty for the City to defend any claims which do not, at the time of tender, allege facts which would fall within the scope of the indemnity.

Rizzo would separate the defense and indemnity provisions, and argue that, regardless of the scope of the City's obligation to indemnify (which will be resolved at a later date), the City agreed to "defend . . . [Rizzo] against any claim, demand,

18

judgment or action, of any type or kind, arising out of any act or failure to act" as long as the act or failure to act was alleged to be within the course and scope of Rizzo's employment. Yet this overlooks the fact that the defense obligation is part and parcel of the indemnity obligation, and the legal principle that the City need not defend if the underlying actions do not allege claims that could at least potentially give rise to a duty of indemnity.[15]

Thus, it is critical to determine the scope of the indemnity obligation. Specifically, as Rizzo seeks defense of the City's action and the AG's action on behalf of the City, we must determine whether the indemnity clause can reasonably be interpreted to include claims made by the City, or on its behalf. We believe that the question must be answered in the negative.

As we have discussed, indemnity agreements generally apply only to third-party claims. In order for an indemnity agreement to encompass claims between the parties to the agreement, and to act as an exculpatory clause or release, there must be clear and explicit language to that effect. No such language is present in the agreement before us. Indeed, there is language indicating a contrary intent. The final sentence of the

---

[15]    At oral argument, Rizzo suggested that the defense agreement could be severed from the indemnity clause under the employment contract's severability clause. That clause provides, in full: "This Agreement is severable, and if any provision or part hereof is judicially declared invalid, the remaining provisions shall . . . remain in force and effect." This provides no basis for Rizzo's attempt to parse the indemnity clause. The indemnity language of the indemnity clause is in no way invalid. That the indemnity language limits the scope of the defense obligation is no basis to strike the indemnity language from the agreement. A party to an agreement cannot use the severability clause to remove from the agreement legally valid enforceable language which has the effect of limiting other language which he would prefer to be unlimited.

19

indemnification clause gives the City the right to compromise and settle "any such claim or suit" (that is, a claim or suit within the scope of the indemnity agreement) provided it bears the cost of the settlement. Such language can only be read to apply to claims or suits by third parties. The idea that the City "may compromise and settle" a suit brought by the City against Rizzo, if it pays itself the settlement amount, would make no sense whatever. The language of this clause is that of a third-party indemnity only. It is not reasonably susceptible of an interpretation that it also releases Rizzo from any liability to the City itself.

As the indemnity agreement does not apply to first-party claims, the defense obligation cannot extend to such claims either. The City is only obligated to defend actions which allege facts which could potentially give rise to a claim of indemnity. As both the City's action and the AG's action were brought on behalf of the City, and the City has no duty to indemnify for such claims,[16] it has no duty to defend them.

We believe the same conclusion applies to the issue of whether a defense is owed for the criminal actions. The language of the indemnity clause clearly applies to third-party civil actions, not criminal complaints and indictments. We again note the provision allowing the City to settle the actions on behalf of Rizzo, as long as it pays the settlement. This provision demonstrates that criminal actions were not contemplated by the agreement; Rizzo could not agree to allow City to enter into a plea bargain on his

---

[16]     This determination does not turn on whether the acts alleged by the Attorney General and the City were within the course and scope of Rizzo's employment. Instead, it turns on the fact that the Attorney General and the City both brought actions *against* Rizzo *on behalf of* the City. That fact alone excludes the actions from the scope of the indemnity agreement as a matter of law.

20

behalf, nor could the City agree to serve a sentence on Rizzo's behalf. As the indemnification clause, as a factual matter, did not extend to criminal actions, the defense obligation could not do so either. However, there is a more fundamental reason why the City owes Rizzo no duty to defend the criminal actions: it is statutorily prohibited from doing so.

2. *Government Code Limitations on Provision of a Defense*

The Government Code contains various provisions relating to a public entity's obligation to provide its employees, or former employees, with a defense to actions arising out of acts taken in the course and scope of their employment.[17] These provisions are all found in the California Tort Claims Act, which was enacted in 1963 "in order to provide a comprehensive codification of the law of governmental liability and immunity." (*Los Angeles Police Protective League v. City of Los Angeles, supra,* 27 Cal.App.4th at p. 174.) At issue in the instant writ petition is whether, and to what extent, a public entity and its employee are free to contract around these provisions, in order to give the employee greater defense rights. Rizzo concedes that, with respect to the criminal actions, there is no statutory duty for the City to provide him with a defense. We therefore consider whether the City is permitted to contract to provide him a defense to the criminal actions. In order to do so, we first discuss the legislative

---

[17] The statutes that we will discuss relate to actions against employees or former employees for acts or omissions occurring within the course and scope of their employment with the public entity. In the interests of brevity, and unless it is otherwise clear from the context, when we use the phrase "public employee," it should be understood to mean an employee or former employee alleged to have acted (or failed to act) within the course and scope of public employment.

21

framework – briefly addressing provisions of the Tort Claims Act governing defenses to civil and criminal actions – before turning to the key issue of the extent to which a public entity may contract to provide additional defense rights in criminal actions.

a.  *Relevant Provisions of the Tort Claims Act*

As to the obligation to defend a civil action, there is a general provision, followed by two exceptions.  The general provision provides, "Except as otherwise provided in Sections 995.2 and 995.4, upon request of [a public employee], a public entity shall provide for the defense of any civil action or proceeding brought against him, in his official or individual capacity or both . . . . "  (Gov. Code, § 995.)

As already noted, Government Code section 995.2, provides:  "(a) A public entity may refuse to provide for the defense of a civil action or proceeding brought against [a public employee] if the public entity determines any of the following:  [¶] (1) The act or omission was not within the scope of his or her employment.  [¶]  (2) He or she acted or failed to act because of actual fraud, corruption, or actual malice.  [¶] (3) The defense of the action or proceeding by the public entity would create a specific conflict of interest between the public entity and the [public employee].  For the purposes of this section, 'specific conflict of interest' means a conflict of interest or an adverse or pecuniary interest, as specified by statute or by a rule or regulation of the public entity."

Government Code section 995.4 provides:  "A public entity may, but is not required to, provide for the defense of:  (a) An action or proceeding brought by the public entity to remove, suspend or otherwise penalize its own [public employee], or an

22

appeal to a court from an administrative proceeding by the public entity to remove, suspend or otherwise penalize its own [public employee].  [¶]  (b) An action or proceeding brought by the public entity against its own [public employee] as an individual and not in his official capacity, or an appeal therefrom."

It is important to recognize that the language of each of these statutory exceptions is permissive.  That is to say, the provisions of Government Code section 995.2, subdivision (a) indicate circumstances in which a public entity "may refuse" to provide a defense for a public employee; they do not suggest that the public entity *may not* provide a defense in those circumstances.  Similarly, Government Code section 995.4 specifically states that, when its circumstances exist, the public entity "may, but is not required to" provide the defense.

The language set forth above is to be contrasted with the language of Government Code section 995.8, which governs the provision of a defense to *criminal* actions.  It provides:  "A public entity is not required to provide for the defense of a criminal action or proceeding . . . brought against a [public employee], but a public entity may provide for the defense of a criminal action or proceeding . . . brought against an employee or former employee if:  [¶] (a) The criminal action or proceeding is brought on account of an act or omission in the scope of his employment as an employee of the public entity; and [¶] (b) The public entity determines that such defense would be in the best interests of the public entity and that the employee or former employee acted, or failed to act, in good faith, without actual malice and in the apparent interests of the public entity."  This language is restrictive.  It indicates that a public

23

entity "may provide" a defense for a public employee *if* the two circumstances set forth in the statute exist; it does not in any way suggest that a public entity may also provide a defense if those circumstances do not exist.

      b.      *Government Code Section 996.6 Does Not Permit a Public Entity to Provide Greater Defense Rights to a Public Employee Facing Criminal Prosecution*

Rizzo argues that an additional provision, Government Code section 996.6, allows a public entity to agree to provide greater defense rights for public employees charged with crimes than the limited rights set forth in Government Code section 995.8. Government Code section 996.6 provides, in its entirety, "The rights of an employee or former employee under this part are in addition to and not in lieu of any rights he may have under any contract or under any other enactment providing for his defense."

There is little law interpreting this provision, although dicta in *Los Angeles Police Protective League v. City of Los Angeles, supra,* 27 Cal.App.4th 168, supports Rizzo's interpretation. That language states, "public entities and employees can voluntarily agree to change the indemnity structure of the Tort Claims Act by collective bargaining. Government Code section 996.6 provides that if the City agrees to indemnify the criminal defense costs of its employees,[18] it may do so. Likewise, if the City decides to provide greater indemnity rights to its employees under a City ordinance, that ordinance will be upheld." (*Id*. at pp. 181-182.) To the extent that this

---

[18]    The facts in that case involved public employee criminal defendants who sought indemnification for their criminal defense costs from their public entity employer after they had been acquitted. Rizzo does not seek such limited relief, arguing that the City has a contractual obligation to provide him with a defense to *pending* charges.

24

language suggests that a public entity can contract with its employees to provide a criminal defense when the circumstances of Government Code section 995.8 which allow such a defense are *not* present, we respectfully disagree.

The key language in Government Code section 996.6 provides that the defense rights in the Tort Claims Act are "in addition to . . . any rights [the public employee] may have under any contract . . . providing for his defense." Rizzo interprets this provision to mean that the public entity may contract with the public employee to provide him with greater rights than those permitted by the provisions of the Tort Claims Act. An alternative interpretation, however, is that this language simply means that the public entity is required to provide the public employee with a defense according to the terms of the Tort Claims Act, regardless of whether the public employee has a contract with a third party (e.g., an insurer) to also provide the employee with a defense. (*Pacific Indem. Co. v. American Mut. Ins. Co.* (1972) 28 Cal.App.3d 983, 993-994.) In determining which interpretation is correct, we consider statutory analysis and legislative history.

### (1)    *Statutory Analysis*

"Our primary duty when interpreting a statute is to ' "determine and effectuate" ' the Legislature's intent. [Citation.] To that end, our first task is to examine the words of the statute, giving them a commonsense meaning. [Citation.] If the language is clear and unambiguous, the inquiry ends. [Citation.] However, a statute's language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]" (*Van Horn v. Watson* (2008) 45 Cal.4th

25

322, 326.)  A " '[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute.  The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.'  [Citation.]"  (*Id*. at p. 327.)  Moreover, we avoid interpretations which would render other statutes unnecessary surplusage.  (*Id*. at p. 333.)

It is clear that Rizzo's interpretation would read the bulk of Government Code section 995.8 out of existence.  Government Code section 995.8 provides that a public entity *may* provide a public employee a defense to a criminal action *if* the public entity determines that the defense would be in the best interests of the public entity and that the public employee had acted in good faith and without malice.  If Government Code section 996.6 is interpreted to mean that a public entity can contract to provide a public employee with a criminal defense even when Government Code section 995.8 does not specifically allow it, there is no need for the restrictions of Government Code section 995.8.  Government Code section 995.8 would effectively be rewritten to state "A public entity is not required to provide for the defense of a criminal action brought against a public employee, but may provide such a defense whenever it agrees to do so." Had the Legislature sought to enact such a provision, it could have done so.  Indeed, the Legislature used such permissive language when discussing the provision of a defense of a civil action brought by the public entity itself, stating that the public entity "may, but is not required to, provide for the defense of" such an action.  (Gov. Code, § 995.4.)  As the Legislature used restrictive language in Government Code section 995.8, we

26

must assume that the Legislature intended to do so, and did not intend to undermine that language with the general language in Government Code section 996.6.

(2) *Legislative History*

We are fortunate in that the legislative history of the key language in Government Code section 996.6, as well as of Government Code section 995.8, is available and is unambiguous. We first consider that of Government Code section 996.6.

Prior to the enactment of the comprehensive Tort Claims Act, the predecessor statute to Government Code section 996.6 was Government Code former section 2001, subdivision (4). That language provided, "The rights of a public employee under this section are in addition to and not in lieu of any rights the employee may have under any other law, charter, ordinance or regulation providing for the defense of a public employee." (Stats. 1961, ch. 1692, § 2, p. 3669.) At that time, the statute did not refer to contracts in any way.

In 1963, the California Law Revision Commission issued its recommendations, which would later provide the basis for the Tort Claims Act. The Law Revision Commission stated, "The recommended legislation should be in addition to and not in lieu of any rights the public employee may have under any contract [footnote citing to 39 Ops. Cal. Atty. Gen. 71 (1962)] or under any other law, charter, ordinance or regulation providing for his defense." (Recommendations Relating to Sovereign Immunity, No. 4, Defense of Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 1309.) Clearly, then, the addition of the word "contract" to the language

27

then existing in Government Code former section 2001 was due to the cited Attorney General opinion.

That opinion involved a police officer, who had, at his own expense, purchased a false arrest insurance policy, and was seeking a defense from his employing entity. (39 Ops. Cal. Atty. Gen. at p. 71.) The question presented was whether the entity could avoid paying the defense costs on the theory that its employee already had an insurance policy which would provide a defense. The Attorney General rejected the argument, stating, "To permit the public entity to avoid a statutory duty by relying upon the contractual duty owed by a third party would be akin to the creation of a novation without the necessary consent or agreement of the obligee to release the additional obligor [citation]. It is concluded, therefore, that the terms of the insurance contract relative to the insurer's duty to defend have no bearing upon the statutory duty of the public entity which upon request of the employee is responsible for providing a legal defense at public expense against actions for false arrest and imprisonment or assault and battery arising out of acts performed during the course of his duties." (*Id*. at p. 74.)

Thus, the addition of the word "contract" in what is now Government Code section 996.6 was not intended to allow a public entity to contract to provide its public employee with additional defense rights beyond those provided in the Tort Claims Act itself, but merely to prevent a public entity from relying on the contractual obligations owed by *others* to the public employee to satisfy its own statutory obligations.

This interpretation is consistent with the legislative history of Government Code section 995.8, which was intended to provide a public entity with very limited rights to

28

provide a public employee with a criminal defense. The Law Revision Commission explained, "A public entity should be authorized, but not required, to defend a criminal action or proceeding brought against a public employee on account of an act or omission occurring in the scope of his public employment if the public entity determines that such defense would be in the best interests of the public entity and that the employee acted in good faith, without actual malice and in the apparent interests of the public entity. Public entities do not now have this authority. The Commission has been advised, however, that cases occasionally arise where a criminal proceeding is brought against a public employee who was simply carrying out his orders. For example, one case brought to the attention of the Commission involved a school district employee charged with criminal assault for ejecting a bully from a school playground. Because the school district was not authorized to provide him with counsel, this employee was required to secure his own attorney to make an appropriate motion to dismiss the criminal proceeding brought against him. The Commission has concluded, therefore, that it would be sound public policy to give public entities a *limited discretionary authority* to defend criminal actions and proceedings brought against their employees." (Recommendations Relating to Sovereign Immunity, No. 4, Defense of Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 1308, italics added, footnote omitted.) The limited discretionary authority of Government Code section 995.8 would be defeated by Rizzo's interpretation of Government Code section 996.6.

We therefore conclude that Government Code section 996.6 simply provides that a public entity's defense obligations, as set forth in the Tort Claims Act, are in addition to any other contractual rights the public employee may have to a defense.[19] Government Code section 996.6 does not permit a public entity to provide a defense where other sections of the Tort Claims Act would prohibit such a defense. As Government Code section 995.8 prevents a public entity from providing its employee a defense to a criminal action unless the public entity determines that the defense would be in the best interests of the public entity and that the public employee had acted in good faith and without malice, no contractual provision requiring a criminal defense under any other circumstances can be enforced.[20] Thus, although we conclude that the City *did not* contract to provide Rizzo with a defense to any criminal action which might have been brought against him, we further conclude that the City was prohibited, in any event, from doing so.

---

[19] In fact, the City had an insurance policy under which Rizzo was an additional insured. Rizzo sought a defense under the policy from the City's insurer. Recently, the district court granted the insurer's motion for summary judgment, on the basis that policy exclusions applied. (*Rizzo v. Insurance Company of the State of Pennsylvania* (C.D. Cal. Aug. 30. 2013, CV 12-04347 DMG (FMOx)) 2013 WL 4675063.)

[20] A public entity cannot agree in advance that any time its public employee is subsequently charged with a crime, the provision of a defense would be in the best interests of the public entity and the public employee will have acted in good faith and without malice. These are determinations which, by necessity, must be made on a case by case basis, after the criminal prosecution has begun. (See Recommendations Relating to Sovereign Immunity, No. 4, Defense of Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) pp. 1308-1309.)

3.    *Public Policy Supports Our Conclusions*

While we base our opinion on the language of the contract and controlling law, it is also important to not lose sight of the policy issues implicated.  Rizzo is alleged to have "embezzled, stole, and misappropriated millions of dollars in City funds" over a period of 17 years.  When the City sought restitutionary relief for such losses, by means of civil actions brought by itself and the Attorney General on its behalf, and the District Attorney initiated criminal prosecutions, Rizzo's response was to demand that the City defend him against the allegations in all such actions.  This is not a case in which the public entity has chosen to stand behind its employee, perhaps wrongly accused by third parties.  Instead, the entity has brought the accusations itself, and (when asked to provide a defense) has made a specific finding that its employee acted out of fraud, corruption, or malice.

Under these circumstances, we find it difficult to believe that any expenditure of City funds to defend Rizzo would not constitute an impermissible waste of public funds. In this regard, we are guided by *Tenwolde v. County of San Diego* (1993) 14 Cal.App.4th 1083.  That case concerned a lieutenant in the sheriff's public affairs division, who, at the request of the sheriff, distributed to the public materials which took a position on a political matter.  A suit was brought to enjoin the practice, and the sheriff agreed to stop the distribution.  Thereafter, both the sheriff and the lieutenant were held liable for the plaintiffs' costs and attorneys fees in the underlying action.  The lieutenant sought reimbursement from the county for those funds.  The trial court ordered reimbursement, and the county appealed, "complaining the judgment require[d]

31

the taxpayers to indemnify [the plaintiff] for 'having squandered taxpayer resources in the first place.' " (*Id*. at p. 1088.)

On appeal, the judgment was reversed. The court noted that while the county may be liable to indemnify the lieutenant if he had been held liable to a *third party* injured by his lobbying activities, the instant situation was different. "This was not a case of injury to a third party. It was, instead, an action to block illegal activities by a public agency. The injury resulting from the illegal activity was an injury to the public itself. The title to the article here under discussion is 'Indemnification of Public Employees.' [Citation.] While the text of the statutes in question does not use the word 'indemnification,' it is clear that this is the principle with which we deal. Granted, these indemnification provisions are statutory, and hence common law concepts are not necessarily applicable. However, indemnification is typically a tripartite concept, resting upon equitable principles. Ordinarily, it is the right of one who has satisfied another's debt to a third party to recover from the principal obligor. [Citation.] It makes no sense to talk about indemnification of a claim upon an indemnitee when the claim arises from damage by the indemnitee to the indemnitor. Here the wrong giving rise to the expenditure of fees and costs was an illegal expenditure of County funds— a tort by the sheriff's lieutenant against his own employer. When the party committing the wrong is stopped, and then assessed costs and fees, it would not be logical, and certainly would not accord with equitable principles, to require the wronged party, the County, to reimburse the employee." (*Tenwolde v. County of San Diego, supra,* 14 Cal.App.4th at p. 1092.)

The court went on to note that, although the plaintiff in the underlying action had been a private party, the Attorney General could have brought the underlying action instead, in its capacity as the "public entity generally authorized to enforce [the] laws of the state." (*Tenwolde v. County of San Diego, supra,* 14 Cal.App.4th at p. 1093.) "[H]ad the action been brought by the Attorney General, with the resulting halt in the sheriff's political activities, and had thereafter costs been assessed against [the lieutenant], would there have been any question about the denial of reimbursement of those costs from the very entity sought to be protected by the lawsuit? We think not." (*Ibid.*) The award was for the benefit of the county and its citizens. "When, then, a cost award including fees based on the 'private attorney general doctrine' is made, it would turn the objective of the suit on its head to require indemnification of the judgment by the very governmental agency the suit sought to benefit." (*Id*. at p. 1094.)

We recognize that *Tenwolde* is distinguishable, in that it pertained to indemnification rather than defense costs, and was specifically concerned with statutory indemnification rather than contractual indemnification. We further recognize that the statutes permit a public entity to choose to pay defense costs for an action it brings against its own employee. Nonetheless, *Tenwolde*'s discussion of the policy issues is illuminating. The City is of the belief that Rizzo stole millions of dollars from its coffers; the idea that the City must pay Rizzo additional funds in order provide him a defense against the very actions seeking to obtain justice for the City is unacceptable.

Public policy necessarily rejects the concept that a public entity allegedly victimized by a corrupt employee must provide that employee with a defense to those

33

charges.  The Tort Claims Act does not require such a result.  A contract term intended only to provide the employee with indemnification from, and a defense to, third party actions, cannot be interpreted to require that result.  Moreover, to the extent that we are concerned with the provision of a defense to criminal actions, a contract could not require that result, even if the parties had intended it.

## *DISPOSITION*

The petition is granted.  The matter is remanded to the trial court with directions to conduct further proceedings consistent with this opinion.  Costs shall be awarded to the City in these writ proceedings.


***CERTIFIED FOR PUBLICATION***


CROSKEY, J.

WE CONCUR:



KLEIN, P. J.



ALDRICH, J.